CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01168 (SHL) |
| Plaintiff, | |
| v. | |
| Digital Currency Group, Inc. | |
| Defendant. | |

**NOTICE OF VOLUNTARY STAY OF PROSECUTION
OF COMPLAINTS AGAINST DIGITAL CURRENCY
GROUP, INC. AND DCG INTERNATIONAL INVESTMENTS LTD.**

**PLEASE TAKE NOTICE** that, on January 19, 2023 (the "Petition Date"),
Genesis Global Holdco, LLC and its affiliates Genesis Global Capital, LLC ("GGC") and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and the cases, the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that on September 6, 2023, GGC initiated adversary proceedings by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01168 (SHL) (the "DCG Complaint") against Digital Currency Group, Inc. ("DCG") and the *Complaint*, ECF No. 1, Adv. Pro. 23-01169 (SHL) (the "DCGI Complaint," and together with the DCG Complaint, the "Complaints") against DCG International Investments Ltd. ("DCGI") seeking turnover of certain property pursuant to 11 U.S.C. § 542(b).

PLEASE TAKE FURTHER NOTICE that GGC hereby stays prosecution of the Complaints, subject to the terms and conditions of the *Partial Repayment Agreement* dated as of September 12, 2023 between GGC, DCG and DCGI (attached hereto as **Exhibit A**) without prejudice to its ability to continue to pursue the Complaints.

PLEASE TAKE FURTHER NOTICE that GGC reserves its rights to pursue the Complaints, amend the allegations therein, or take any other actions with respect of the turnover claims asserted in the Complaints.

Dated:    September 12, 2023
           New York, New York

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel for the Debtors*
*and Debtors-in-Possession*

<u>**Exhibit A**</u>

**Partial Repayment Agreement**

EXECUTED VERSION

## PARTIAL REPAYMENT AGREEMENT

This PARTIAL REPAYMENT AGREEMENT, dated as of September 12, 2023 (this "Agreement"), is entered into among Genesis Global Capital, LLC ("GGC"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 250 Park Avenue South, 5th Floor, New York, New York 10003, Digital Currency Group, Inc. ("DCG"), a Delaware corporation with its principal place of business at 290 Harbor Drive, 5th Floor, Stamford, Connecticut 06902, and DCG International Investments Ltd. ("DCGI", together with DCG, the "DCG Parties" and together with GGC, the "Parties"), a company incorporated in and existing under the laws of Bermuda, with its registered office at Century House, 16 Par-la-Ville Road, Pembroke, HM 08, Hamilton, Bermuda.  All capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the DCG MLA (as defined below) or the DCGI MLA (as defined below), as applicable.

## RECITALS:

WHEREAS, reference is made to (i) that certain Amended and Restated Master Loan Agreement, dated as of November 10, 2022 (the "DCG MLA"), by and between GGC, as Lender, and DCG, as Borrower and (ii) that certain Master Loan Agreement, dated as of June 21, 2019 (the "DCGI MLA" and, together with the DCG MLA, the "MLAs"), by and between GGC, as Lender, and DCGI, as Borrower).

WHEREAS, under the DCG MLA, the following Loans are currently outstanding:

(i)     that certain loan dated January 24, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "January 24 Loan");

(ii)    that certain loan dated February 23, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "February 23 Loan");

(iii)   that certain loan dated May 9, 2022, with a principal amount equal to $200,000,000 (the "May 9 Loan"); and

(iv)    that certain loan dated May 10, 2022, with a principal amount equal to $100,000,000 (the "May 10 Loan" and together with the January 24 Loan, the February 23 Loan, and the May 9 Loan, the "DCG Loans").

WHEREAS, under the DCGI MLA, that certain loan dated June 22, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to 4,550.45173345 BTC (the "June 22 Loan"), is currently outstanding.

WHEREAS, under the DCGI MLA, that certain term loan dated September 21, 2020, and that certain term loan dated December 21, 2020 with a cumulative principal amount equal to 14,048 BCH (the "BCH Loan" and, together with the June 22 Loans, the "DCGI Loans") are currently outstanding.

WHEREAS, as of the date hereof, the following Events of Default (collectively, the "Specified Admitted Events of Default") under the MLAs, as applicable, have occurred and are continuing:

(i)      an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to return any and all Loaned Assets outstanding under the January 24 Loan, the February 23 Loan, May 9 Loan and the May 10 Loan, in each case, when due between May 9, 2023 and May 11, 2023;

(ii)     an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to return any and all of the remaining BTC under the June 22 Loan when due on May 11, 2023;

(iii)    an Event of Default under Section VIII(b) of the DCGI MLA relating to the failure of DCGI to pay any and all Late Fees under the June 22 Loan within ten (10) days of the date when due;

WHEREAS, as of the date hereof, GGC has alleged, and DCG and DCGI dispute, that the following Events of Default (collectively, the "Specified Potential Events of Default" and, together with the Specified Admitted Events of Default, the "Specified Events of Default") under the DCG MLA or the DCGI MLA, as applicable, may have occurred and may be continuing:

(i)      an Event of Default under Section VIII(b) of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to pay any and all Loan Fees or Late Fees within ten (10) days of the date when due; and

(ii)     an Event of Default under Section VIII(b) of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to pay any and all Loan Fees within ten (10) days of the date when due.

WHEREAS, on December 15, 2022, DCG sent a letter to GGC asserting that DCG had effectuated a setoff, as of November 17, 2022, of the approximately $52.5 million DCG paid to Luno Australia Pty Ltd ("Luno") pursuant to the Limited Guaranty, dated November 11, 2022, between DCG and Luno, under which DCG guaranteed up to $60 million of GGC's obligations to Luno (under that certain Master Digital Assets Loan Agreement dated August 30, 2022).

WHEREAS, as described in the December 15, 2022 letter to GGC, DCG asserts that it exercised its subrogation rights to Luno and set off the $52.5 million paid by DCG to Luno against amounts DCG owes to GGC under the January 24 Loan (the "Luno Setoff").

WHEREAS, GGC disputes the validity of the Luno Setoff.

WHEREAS, on August 29, 2023, the Genesis Debtors, the Committee and DCG announced an agreement-in-principle as set forth on that certain *Notice of Mediation Termination*, ECF No. 625 (the "Agreement in Principle") filed in the Genesis Chapter 11 Cases.

WHEREAS, on May 9, 2023, DCG sent GGC a request for wire instructions by email at 10:37 p.m. (ET) (the "Wire Instructions Request") to convert the Loans issued under the DCG MLA to Open Loans.

WHEREAS, on May 9, 2023, GGC responded to the Wire Instructions Request, which response, under the terms of the DCG MLA, constituted a denial by GGC of DCG's request to convert such loans to Open Loans.

WHEREAS, on May 12, 2023, GGC sent the DCG Parties a Notice of Default and Reservation of Rights letter ("GGC Notice of Default Letter"), which noted, among other things, that the Loans issued under the DCG MLA and DCGI MLA were due and owing, and that Late Fees were accruing under the DCG MLA and DCGI MLA.

WHEREAS, on May 25, 2023, the DCG Parties responded to the GGC Notice of Default Letter noting, among other things, that the DCG Parties dispute GGC's assertion that Late Fees are accruing under the DCG MLA and that any Late Fees on Loan Fees are accruing under the DCG MLA and DCGI MLA.

WHEREAS, the disputes relating to the validity of the Luno Setoff and the accrual of Late Fees under the DCG MLA and DCGI MLA remain open disputes and, notwithstanding anything contained in this Agreement, the Parties reserve all of their rights and defenses with respect thereto.

WHEREAS, DCG acknowledges and agrees that the Specified Admitted Events of Default have occurred and are continuing and GGC has the right under Section XII of each of the DCG MLA and the DCGI MLA to seek reimbursement for all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights thereunder.

WHEREAS, the DCG Parties have requested, and GGC has agreed to, subject to the terms and conditions set forth herein, the Forbearance (as defined below) during the Forbearance Period (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises, and covenants set forth below, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Defined Terms.  For purposes of this Agreement, the following terms, in addition to the terms defined in the preamble and recitals above, shall have the following meanings:

(a)      "Asset Carve-Out Schedule" has the meaning set forth in Section 3 of this Agreement.

(b)      "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the chapter 11 cases of the Genesis

Debtors and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

(c)       "BTC" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

(d)       "BTC Portion" has the meaning set forth in Section 6(a) of this Agreement.

(e)       "Capital Stock" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest, and profits interests, participations, or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

(f)       "Committee" means the Official Committee of Unsecured Creditors appointed in the Genesis Chapter 11 Cases.

(g)       "Digital Asset" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins, and tokens, such as security tokens, utility tokens, and governance tokens.

(h)       "Event of Bankruptcy" shall mean, with respect to any person or entity, such person or entity (i) is dissolved, (ii) makes a general assignment, arrangement, scheme or composition with or for the benefit of its creditors generally, or such general assignment, arrangement scheme or composition becomes effective, (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other similar relief under any bankruptcy or insolvency law or other law affective creditors' rights, or a petition is presented for its winding-up or liquidation, (iv) has a resolution passed for its winding-up or liquidation, (v) seeks or becomes subject to the appointment of an administration, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets, (vi) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced, sued on or against all or substantially all its assets, or (vii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in (i) to (vii) above.

(i)       "Forbearance" has the meaning set forth in Section 4 of this Agreement.

(j)       "Forbearance Fee" has the meaning set forth in Section 6(b) of this Agreement.

(k)     "Forbearance Period" shall mean the period commencing on (and including) the Partial Repayment Agreement Effective Date and ending on the Forbearance Termination Date.

(l)     "Forbearance Termination Date" means the earliest of (i) the Plan Effective Date, (ii) the date on which GGC or the DCG Parties, as applicable, delivers a Termination Notice in accordance with Section 7 hereof and (iii) the date on which an Automatic Forbearance Termination Event occurs.

(m)     "Forbearance Termination Event of Default" has the meaning set forth in Section 7 of this Agreement.

(n)     "Genesis Chapter 11 Cases" means, collectively, the cases commenced by the Genesis Debtors in the Bankruptcy Court jointly-administered under the case caption *In re Genesis Global Holdco, LLC, et al*., Case No. 23-10063.

(o)     "Genesis Debtors" means, collectively, GGC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd.

(p)     "Global Restructuring Agreement" means that certain Global Restructuring Agreement that may be executed by and among the Genesis Debtors, DCG and the Committee in accordance with the Agreement in Principle.

(q)     "Indebtedness" means, with respect to any person or entity (i) all indebtedness for borrowed money; (ii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iii) all Indebtedness secured by any Lien on any property or asset owned or held by such person or entity regardless of whether the Indebtedness secured thereby will have been assumed by such person or entity or is nonrecourse to the credit of that person or entity; (iv) the face amount of any letter of credit issued for the account of such person or entity or as to which such person or entity is otherwise liable for reimbursement of drawings; (v) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such person or entity of indebtedness of any other person or entity in respect of items in clauses (i)-(v) of this definition; (vi) any obligation of such person or entity the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (vii) obligations of such person or entity in respect of derivative transactions or instruments that are not principally for the purpose of hedging such person or entity's exposure; and (viii) obligations of such person in respect of any exchange traded or over the counter derivative transaction entered into for speculative purposes; provided that, notwithstanding the foregoing, Indebtedness shall exclude (i) capital leases, (ii) any obligation owed for all or any part of the deferred purchase price of property, equipment or services, (ii) accounts payable, payroll and other liabilities and accrued expenses incurred in the ordinary course of business that are not overdue by more than one hundred eighty (180) from the date of incurrence of the obligations in respect thereof, (iii) accruals for payroll and other liabilities

5

in the ordinary course of business, or (iv) other credit card, bank product or trade obligations incurred in the ordinary course of operating the DCG Parties' businesses.

(r)    "Loan Documents" has the meaning set forth in Section 10(c) of this Agreement.

(s)    "Material Adverse Change" means any circumstance, condition, or event that would reasonably be expected to materially and adversely affect (i) the business, assets, financial condition or results of operations, in each case, of DCG and its subsidiaries taken as a whole, or (ii) the ability of any DCG Party to perform its obligations under, or otherwise comply with any of the provisions of, this Agreement or the Loan Documents.

(t)    "Minimum Repayment Amount" has the meaning set forth in Section 6 of this Agreement.

(u)    "Net Proceeds" means the proceeds in excess of $10 million after payment of transaction expenses from any disposition of assets on the Asset Carve-Out Schedule.

(v)    "New Second Lien Facility" means the second-lien facility contemplated by the Agreement in Principle, as may be amended in the Global Restructuring Agreement, proposed to be entered into on the Plan Effective Date by DCG, as borrower, and GGC, as lender.

(w)    "Notice of Stay" has the meaning set forth in Section 6(a) of this Agreement.

(x)    "Partial Repayment Agreement Effective Date" has the meaning set forth in Section 5 of this Agreement.

(y)    "Payment Date" means the date on which each of the First Payment, Second Payment or Third Payment is due under this Agreement.

(z)    "Plan Effective Date" means the effective date of the chapter 11 plan for the Genesis Debtors in the Genesis Chapter 11 Cases.

(aa)   "Restricted Junior Payment" means (i) any dividend, other distribution, or liquidation preference, direct or indirect, on account of any shares of any class of Capital Stock of DCG now or hereafter outstanding; (ii) any redemption, retirement, sinking fund, or similar payment, purchase, or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iv) management or similar fees payable to any of the holders of Capital Stock issued by DCG; and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund, or similar payment with respect to, any indebtedness that is contractually subordinated in payment ranking to the obligations under the Loan Documents; provided, however, that nothing contained herein shall (a) affect the DCG Parties' ability to

6

effectuate any transactions set forth in (i) – (v) above if each such transaction is below $3 million or $8 million cumulatively, or (b) restrict DCG's issuance of shares of any class of Capital Stock to current and/or former employees pursuant to an ordinary course contractual or legal obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements; provided further that such transaction or issuance is otherwise compliant with Section 3 herein.

(bb)    "Termination Notice" has the meaning set forth in Section 7 of this Agreement.

(cc)    "Turnover Actions" collectively mean those certain complaints filed in the Genesis Chapter 11 Cases on September 6, 2023, captioned as *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. 23-01168 and *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Adv. Pro. 23-01169, with respect to certain amounts outstanding under the DCG MLA and the DCGI MLA, respectively.

(dd)    "USD Portion" has the meaning set forth in Section 6(a) of this Agreement.

2.    Agreements and Acknowledgements.

(a)    Each DCG Party acknowledges, represents and warrants that the recitals to this Agreement are true and correct in all material respects.

(b)    Each DCG Party acknowledges and agrees that, as of the Partial Repayment Agreement Effective Date (as defined below), without giving effect to any reductions as shall be set forth in the Global Restructuring Agreement, (i) the aggregate outstanding principal amount of Loans under the DCG MLA is $500,000,000.00, (ii) the aggregate outstanding principal amount of Loans under the DCGI MLA is 4,550.45173345 BTC and 14,048 BCH, and (iii) the total outstanding amount of Late Fees under the DCGI MLA as of August 31, 2023 is 70.43849944 BTC.  Each of DCG and DCGI acknowledges, represents and warrants to GGC that such obligations are validly owed or owing under the respective MLAs, and each of DCG and DCGI is obligated with respect to the DCG MLA or the DCGI MLA, as applicable.

(c)    DCG acknowledges that GGC has not waived, released, or compromised any occurrences, acts, or omissions that may constitute or give rise to any defaults or Events of Default (including the Specified Events of Default) that existed or may have existed, may presently exist, or may arise in the future, nor does GGC waive any rights or remedies under the Loan Documents (other than, to the extent expressly set forth herein, with respect to the Specified Events of Default during the Forbearance Period) or any other agreements or arrangements with DCG or DCG not governed by the MLAs or terms sheets in respect thereof.  The Specified Admitted Events of Default shall be deemed to have occurred and be continuing for all purposes under the MLAs and the other Loan Documents, notwithstanding any subsequent cure or any other event or condition after the date hereof that would cause any Specified Admitted Event of Default to be no longer continuing, and

such Specified Admitted Event of Default may only be cured or waived on terms and conditions satisfactory to GGC.

3.      <u>Negative Covenants</u>.  Without the prior written consent of GGC, each DCG Party agrees that it shall not, during the Forbearance Period (unless the Forbearance Period is terminated pursuant to Section 7(a)(ii) of this Agreement, in which case this Section 3 shall survive the termination of the Forbearance Period or this Agreement), (a) directly or indirectly dispose of any assets having a fair market value in excess of $10 million in any single transaction or series of transactions or in excess of $30 million in aggregate, <u>provided</u>, however, a DCG Party may transfer assets identified on a schedule as agreed upon by the Parties prior to entry of this Agreement (the "<u>Asset Carve-Out Schedule</u>") if it uses the Net Proceeds to repay amounts due to GGC under the Loan Documents, (b) create, incur, assume, or otherwise become or remain liable with respect to any Indebtedness in an amount exceeding $30 million, (c) declare, order, pay, make, or set apart, or agree to declare, order, pay, make, or set apart, any sum for any Restricted Junior Payment, except with respect to DCG's issuance of any class of Capital Stock to current and/or former employees pursuant to an ordinary course legal or contractual obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements, (d) enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer or consent to any such transaction, liquidation, winding up or dissolution), or dispose of, in any single transaction or series of related transactions, all or substantially all of its assets, or (e) enter into or permit to exist any transaction that is not on an arms' length basis (including the purchase, sale, lease or exchange of any property or the rendering of any service) with (i) any holder of ten percent (10%) or more of any class of Capital Stock of DCG or any of its subsidiaries or any affiliate of such holder, (ii) any affiliate of DCG (excluding the Genesis Debtors), or (iii) any joint venture in which any DCG Party or any of its respective affiliates holds any Capital Stock; provided that the DCG parties shall provide written notice to GGC of any affiliated transactions (other than those described in the following sentence) that are on an arms' length basis no later than two (2) business days after entering into such affiliated transaction; provided further that, if GGC does not file or cause to be filed the Notice of Stay on or prior to the date that is three (3) Business Days after the Partial Repayment Agreement Effective Date, the foregoing restrictions in this Section 3 (as applied to the DCG Parties) shall cease to be effective until such time as the Notice of Stay is filed.  Notwithstanding anything to the contrary herein, this Agreement shall not restrict or prohibit any of the DCG Parties from (A) funding any subsidiaries of the DCG Parties for payroll, overhead or operating costs and expenses of subsidiaries of GGC in the ordinary course, (B) entering into any token rebalancing transactions or selling any token positions, (C) receiving any payments, dividends, distributions or outflows from any of DCG's subsidiaries or companies within the DCG Parties' venture portfolio (D) selling any minority stakes in companies within the DCG Parties' venture portfolio for an aggregate value of no more than $8 million (provided that the foregoing $8 million cap shall not apply to the extent that proceeds from such sales are used to satisfy the DCG Parties' obligations under the Loan Documents), or (E) incurring any debt if the proceeds of such debt will be used to satisfy the DCG Parties' obligations under the Loan Documents; <u>provided</u> that DCG and DCGI shall provide written notice to GGC of any sale or incurrence of debt described in the foregoing clauses (D) and (E) no later than two (2) days following such sale or incurrence.

4.      Limited Forbearance.

(a)      Except as otherwise provided in this Agreement, and subject to the terms and conditions set forth in this Agreement, GGC agrees that during the Forbearance Period it will not pursue or prosecute the Turnover Actions, or (ii) file any action in any jurisdiction and/or initiate any legal proceeding to enforce any of its rights and remedies in respect of the Specified Events of Default (the "Forbearance"); provided that, notwithstanding the Forbearance or anything to the contrary in this Agreement, both GGC and the DCG Parties reserve their rights with respect to whether there are Late Fees accruing on the Loans issued under the DCG MLA; provided, further, that notwithstanding the Forbearance or anything to the contrary in this Agreement, GGC reserves the right to assert that it is entitled to (x) payment of any and all Loan Fees and Late Fees that may become due under the applicable provisions of MLAs (it being understood that DCG disputes that Late Fees are due under the DCG MLA) and (y) reimbursement of all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights under the MLAs, as applicable, in each case including during the Forbearance Period.

(b)      The Forbearance shall be limited precisely as written, relate solely to the Specified Events of Default in the manner and to the extent described in this Agreement, and shall not (i) be deemed a waiver of any default or Event of Default that is not a Specified Event of Default that may now be in existence or that may hereafter occur, nor imply that GGC would be obligated to or would waive any default or Event of Default (including the Specified Events of Default) following the expiration or termination of the Forbearance Period, or (ii) prejudice any right or remedy that GGC may now have or may have in the future under or in connection with the Loan Documents or any other instrument or agreement referred to therein, including, without limitation, any right or remedy in connection with the Specified Events of Default following the expiration or termination of the Forbearance Period.

(c)      Notwithstanding the Forbearance granted pursuant to this Section 4, for the purposes of any provision of the MLAs permitting any action by DCG or DCGI, as applicable, in the absence of a default or Event of Default (or any kind of default or Event of Default), or conditioning any right of DCG, DCGI, or GGC on the absence of a default or Event of Default (or any kind of default or Event of Default), the Specified Events of Default shall be deemed to be continuing upon its occurrence.

(d)      Starting on the first Business Day after the expiration or termination of the Forbearance Period, GGC may at any time thereafter proceed to enforce any or all of its rights and remedies under any Loan Document and applicable law (subject to the terms of the applicable Loan Document and applicable law) in connection with the Specified Events of Default; provided that GGC shall be permitted to exercise any enforcement rights with respect to this Agreement at any time during the Forbearance Period and shall be permitted to file a notice of the termination or expiration of the Forbearance Period immediately upon such termination or expiration; provided further that DCG and DCGI shall have the later of (i) thirty (30) days after such termination or expiration of the Forbearance Period and

(ii) any date as ordered by the Bankruptcy Court, to file an answer in the Turnover Actions, unless the Forbearance Period is terminated pursuant to Section 7(a)(ii), in which case DCG and DCGI shall have ten (10) Business Days after such termination to file an answer in the Turnover Actions.  In furtherance of the foregoing, and notwithstanding the Forbearance, each DCG Party acknowledges and confirms that, following the expiration or termination of the Forbearance Period, all rights and remedies of GGC under the Loan Documents and applicable law in connection with the Specified Events of Default and with respect to the DCG Parties shall continue to be available to GGC.  For the avoidance of doubt, each DCG Party acknowledges and confirms that the Forbearance shall not apply to or preclude any remedy available to GGC in connection with any proceeding commenced by or on behalf of a DCG Party under any bankruptcy or insolvency law, including, without limitation, to any relief in respect of adequate protection or relief from any stay imposed under such law.

(e)     The Parties agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that GGC may be entitled to take or bring in order to enforce its rights and remedies against any DCG Party under the MLAs are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(f)     Each DCG Party understands and agrees to the temporary nature of the Forbearance provided hereby and that GGC has given no assurances that it will, and shall have no obligation to, extend the duration of the Forbearance Period or enter into any other waiver, forbearance, amendment or agreement.  Any agreement by the DCG Parties and GGC to extend the Forbearance Period, if any, shall be set forth in writing and signed by a duly authorized signatory of each of the DCG Parties and GGC.

(g)     The Forbearance granted pursuant to this Section 4 is granted on the condition that no default or Event of Default, other than the Specified Events of Default, shall exist under the Loan Documents.

5.     Effectiveness of Agreement.  This Agreement shall become effective on the first date (such date, the "Partial Repayment Agreement Effective Date") on which this Agreement has been duly executed and delivered by each of the Parties.

6.     Payments of Loans and Fees.  In consideration for the Forbearance as set forth herein:

(a)     The DCG Parties shall pay GGC, in payment of the DCG Loans and the June 2022 Loan, a total of $275,000,000 (the "Minimum Repayment Amount") in accordance with the following payment schedule: (i) $75,000,000 on the earlier of (A) a date within one (1) Business Days after the filing of a notice of stay with respect to the Turnover Actions in the Genesis Chapter 11 Cases (the "Notice of Stay"), which shall occur no later than three (3) Business Days after the Partial Repayment Agreement Effective Date, and (B) the Plan Effective Date (the "First Payment"); (ii) $75,000,000 on the earlier of (A) the date that is 47 days after the Partial Repayment Agreement Effective Date and (B) the Plan Effective Date (the "Second Payment"); (iii) $75,000,000 on the earlier of (A) the

date that is 45 days after the Second Payment and (B) the Plan Effective Date (the "Third Payment"); and (iv) $50,000,000 on the earlier of (A) the date that is 45 days after the Third Payment and (B) the Plan Effective Date; provided that the payments set forth in clauses (i)-(iv) shall cumulatively be made 78% in USD (the "USD Portion") and 22% in BTC (the "BTC Portion") and (2) the obligation of the DCG Parties to make the payments set forth in clauses (i)-(iv) shall be contingent on the timely filing of the Notice of Stay as described in clause (i)(A) above.  Any such USD payments made under this Section 6(a) will first reduce the principal balance of the January 24 Loan until such balance is fully repaid, and next will reduce the principal balance of the May 9 Loan until such balance is fully repaid; any such BTC payments made under this Section 6(a) will reduce the principal balance of the June 22 Loan.  DCG shall solely be responsible for the USD Portion and DCGI shall solely be responsible for BTC Portion.  Nothing herein shall impute joint or several liability to DCG with respect to the BTC Portion, or to DCGI with respect to the USD Portion of the payments, respectively.

(b)     The DCG Parties shall pay a total fee in USD (the "Forbearance Fee") in an amount equal to 0.375% of the aggregate principal amount outstanding of the Loans under the MLAs on the Partial Repayment Agreement Effective Date, each in their respective capacities as Borrowers under the MLAs, as applicable, within two (2) Business Days of the Partial Repayment Agreement Effective Date, and GGC agrees that the Forbearance Fee shall be credited against the USD Portion of the final $50,000,000 payment.  Each of DCG and DCGI shall be jointly and severable liable for the Forbearance Fee.

(c)     Notwithstanding anything to the contrary in the DCGI MLA, DCGI agrees to pay all Late Fees that are or become payable under the DCGI MLA and relevant term sheets in accordance with the terms of such agreements during the Forbearance Period; provided however, all rights and defenses of the Parties are fully preserved with respect to any Late Fees owing under the DCG MLA and relevant term sheets.

(d)     To the extent the DCG Parties make payments pursuant to this Agreement that are in the aggregate greater than the Minimum Repayment Amount (without consideration to any amounts paid under this Agreement in respect of Loan Fees or Late Fees under either the MLAs), DCG shall be entitled to a greater than dollar-for-dollar reduction in the original principal amount of the New Second Lien Facility (as described in the Agreement in Principle, as may be amended in the Global Restructuring Agreement), with an additional $65,000,000 in total aggregate amount of payments exceeding the Minimum Repayment Amount reducing the original principal amount of the New Second Lien Facility by $95,000,000 and each additional $10,000,000 in total aggregate amount of payments thereafter reducing the original principal amount of the New Second Lien Facility by a further $15,000,000; provided, however, that if the Parties do not execute the Global Restructuring Agreement, then any payments made under this Section 6(c) shall reduce the principal balance of the amounts owed under the DCG Loans or June 22 Loan, as applicable, by the amount actually paid, without any greater than dollar-for-dollar reduction.

7.      Default.

(a)      Except in respect of the Specified Events of Default, upon the occurrence of any one or more of the following events (each a "Forbearance Termination Event of Default"), GGC shall provide notice to the DCG Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intent to terminate the Forbearance Period, which termination shall become effective upon the delivery of the Termination Notice to the DCG Parties:

(i)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in this Agreement and (other than in the case of Section 6 (*Payments of Loans and Fees*)) such failure or breach is not cured (if curable) within fifteen (15) calendar days of (x) delivery of a written notice by GGC or (y) any DCG Party having actual knowledge of such breach or failure;

(ii)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition in Section 6 (*Payments of Loans and Fees*)) if such failure or breach is not cured within one (1) Business Day;

(iii)      the occurrence of a Material Adverse Change;

(iv)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in any of the Loan Documents (including the failure to pay Loan Fees as required under the MLAs), other than a Specified Event of Default, and does not cure such failure within any applicable cure period provided in the applicable Loan Document;

(v)      the occurrence of an Event of Default under the DCG MLA or DCGI MLA, other than a Specified Event of Default;

(vi)      any Party fails to observe or perform, or is in breach of, any covenant, term, or condition contained in the Global Restructuring Agreement, and does not cure such failure within any applicable cure period provided in the Global Restructuring Agreement;

(vii)      the termination of the Global Restructuring Agreement in accordance with its terms; or

(viii)      GGC determines, in its sole discretion following consultation with its legal and financial advisors, that termination of this Agreement is appropriate, necessary or consistent with the exercise of its fiduciary duties; provided that, notwithstanding anything to the contrary in this Section 7(a), GGC shall provide the DCG Parties with at least ten (10) calendar days' prior written notice before such termination shall become effective; provided further that in the event a DCG Party makes a payment or uses proceeds from the sale of assets as described in Section 3(a) and Section 3(c) to pay obligations owed under the Loan Documents in advance of the next Payment Date, such payments shall be credited toward the

amounts due on future Payment Dates and GGC shall not exercise the termination right described in this Section 7(a)(viii) prior to the next Payment Date.

(b)     Upon the issuance by any governmental authority, including any regulatory authority or the Bankruptcy Court or a court of competent jurisdiction, of any ruling, judgment, or order enjoining GGC's or any of the DCG Parties' entry into and performance under this Agreement, the Parties may elect to provide notice to the other Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intention to terminate this Agreement, which termination shall become effective upon the delivery of a Termination Notice.

(c)     On or after the date that is forty-seven (47) days after the Partial Repayment Agreement Effective Date, any Party may give written notice to the other Parties of its intention to terminate this Agreement on the date, which termination shall be effective upon the delivery of such notice to the other Parties, in the event that at such time either (i) the Global Restructuring Agreement has not been executed; or (ii) the Genesis Debtors have not filed an amended chapter 11 plan and disclosure statement, consistent with the Agreement in Principle and as otherwise reasonably acceptable to DCG (as may be amended by the Global Restructuring Agreement or as otherwise agreed by the Parties).

(d)     Notwithstanding the foregoing or anything to the contrary in the MLAs, the Forbearance Period shall automatically be terminated without any action necessary by any Party upon the occurrence of an Event of Bankruptcy with respect to DCG or DCGI (an "Automatic Forbearance Termination Event").

(e)     Any notice provided by any Party indicating an intention to terminate either the Forbearance Period or this Agreement pursuant to (and in accordance with the terms of) this Section 7 shall be referred to as a "Termination Notice".

8.     Representations and Warranties of DCG.  To induce GGC to enter into this Agreement, each DCG Party represents and warrants to GGC that, as of the Partial Repayment Agreement Effective Date:

(a)     the execution, delivery, and performance of this Agreement (i) are within such DCG Party's corporate or other organizational powers (as applicable), (ii) have been duly authorized by all necessary corporate or other organizational action (as applicable) on the part of such DCG Party, and (iii) do not and will not breach, violate, conflict with, or constitute a default under (A) any provision of any law or any governmental rule or regulation applicable to such DCG Party, (B) any of the organizational documents of such DCG Party, (C) any order, judgment, or decree of any court or other agency of government binding on such DCG Party, or (D) any agreement to which such DCG Party is a party;

(b)     each of DCG and DCGI has duly executed and delivered this Agreement, and each of this Agreement, the DCG MLA or the DCGI MLA, as applicable, and the applicable Loan Term Sheets constitutes the legal, valid, and binding obligation of such DCG Party enforceable in accordance with its terms; and

13

(c)      (i) other than the Specified Events of Default, no actual or potential default or Event of Default has occurred and is continuing and (ii) except with respect to the Specified Events of Default, all representations and warranties made by either DCG Party contained herein, in the MLAs, as applicable, or in the other Loan Documents are true and correct in all material respects (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects) with the same effect as though such representations and warranties are made on and as of the Partial Repayment Agreement Effective Date, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects).

9.      <u>Representations and Warranties of GGC</u>.  To induce DCG to enter into this Agreement, GGC represents and warrants to the DCG Parties that, as of the Partial Repayment Agreement Effective Date:

(a)      GGC has full legal and corporate authority to enter into and perform under this Agreement without any order of the Bankruptcy Court or any court of competent jurisdiction; and

(b)      Other than the Specified Events of Default, GGC is not aware of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs, as applicable.

10.     <u>Reference to and Effect on Loan Documents</u>.

(a)      <u>Ratification</u>.  Each of DCG and DCGI hereby expressly acknowledges and agrees that all of the terms and conditions of, and their continued obligations and liability (including all of its payment and performance obligations, covenant obligations and obligation to indemnify, contingent or otherwise) under, the MLAs, and the other Loan Documents, as applicable, are hereby ratified and confirmed and continue unchanged and in full force and effect, except as otherwise set forth herein.

(b)      <u>No Waiver</u>.  Except as expressly set forth herein, neither the execution, delivery and effectiveness of this Agreement shall, directly or indirectly, (i) create any obligation to continue to defer any enforcement action with respect to the Specified Events of Default after the occurrence of any Forbearance Termination Event of Default (or with respect to an Event of Default not constituting a Specified Event of Default after the date hereof) or termination of this Agreement; (ii) constitute a consent or waiver of any past, present or future violations, including the Specified Events of Default or any other defaults and Events of Default, of any provisions of the MLAs, or any other Loan Documents; (iii) amend, modify, prejudice or operate as a waiver of any right, power, defense or remedy of GGC or any of its successors under the MLAs, or any of the other Loan Documents; (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction, or (v) constitute a course of dealing or other basis for altering any Loans or any other contract or instrument.  No course of dealing or any passage of time on

14

account of the Forbearance Period shall be considered or used as a basis for asserting an untimely exercise of any such Party's rights, for altering any obligation of any of DCG, DCGI or any other Person or any right, privilege defense or remedy of GGC under the MLAs, or any other Loan Document, or to otherwise prejudice any such right, power, defense or remedy.  The DCG Parties expressly acknowledge and agree that there has not been, and this Agreement does not constitute or establish, a novation with respect to the MLAs, or any of the other Loan Documents.  Except as otherwise expressly provided in this Agreement, GGC hereby reserves all of its rights and remedies under the Loan Documents and any other documents, instruments or agreements executed and delivered in connection therewith and any and all applicable law.

(c)   Loan Document.  On and after the Partial Repayment Agreement Effective Date, this Agreement shall constitute a "Loan Document" as defined under the DCG MLA and shall constitute a "Loan Document" as defined under the DCGI MLA and the term "Loan Documents" shall collectively refer to this Agreement, the DCG MLA, the DCGI MLA, and any and all term sheets entered in connection with such MLAs.

11.   Miscellaneous.

(a)   Successors and Assigns.  This Agreement shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and assigns to the same extent set forth in the Loan Documents.

(b)   Entire Agreement.  This Agreement and the Loan Documents, as amended hereby, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof.

(c)   Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(d)   Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)   Counterparts.  This Agreement may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature

or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f)  Expenses.  Without limiting any terms or provisions of the Loan Documents, the DCG Parties agree, jointly and severally, to pay promptly all reasonable and documented costs and expenses incurred by GGC in connection with the enforcement or protection of GGC's rights under this Agreement, including, without limitation, the reasonable fees, charges, and disbursements of GGC's legal counsel.

(g)  Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.   EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(h)  Appointment of Process Agent.  DCG hereby agrees that service of process in any such action or proceeding brought in connection with the DCG MLA, DCGI MLA, the Loan Agreements, the Turnover Actions or this Agreement, may be made upon it by serving a copy of any relevant pleadings on an agent designated by the DCG Parties (the "Designated Agent"), which shall be irrevocably appointed by the DCG Parties as its agent for service of process in respect of any such action or proceeding.  Within two (2) business days of the Partial Repayment Agreement Effective Date, the DCG Parties shall provide GGC with the identity and address of Designated Agent.  The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by each of the DCG Parties as such, and shall be legal and binding on each of the DCG Parties for all the purposes of any such action or proceeding.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _Mark Murphy_ _____
    Name:  Mark Murphy
    Title:  President

**DCG INTERNATIONAL INVESTMENTS LTD.**

By: _Michael Katz_ _____
    Name:  Mike Katz
    Title:  Legal Officer

Accepted and agreed as of the date first set forth above.

**HOLDER**:

**GENESIS GLOBAL CAPITAL, LLC**

By: _Derar Islim_

Name:

Title: Interim CEO