**Hearing Date and Time: December 13, 2023 at 2:00 p.m. (ET)**
**Objection Deadline: December 6, 2023 at 4:00 p.m. (ET)**

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| Genesis Global Capital, LLC,<br><br>       Plaintiff,<br><br>   v.<br><br>Digital Currency Group, Inc.,<br><br>       Defendant. | Adv. Proc. No. 23-01168 (SHL) |

**NOTICE OF HEARING ON DEBTORS'**
**MOTION FOR ENTRY OF (I) CONSENT JUDGMENT AGAINST**
**THE DCG PARTIES AND (II) ORDER AUTHORIZING, TO THE EXTENT**
**NECESSARY, GGC TO TAKE ACTIONS IN FURTHERANCE OF THE PARTIAL**
**REPAYMENT AGREEMENT PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE**
**BANKRUPTCY CODE, OR, IN THE ALTERNATIVE, BANKRUPTCY  RULE 9019(a)**

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC ("Holdco") (8219); Genesis Global Capital, LLC ("GGC") (8564); and Genesis Asia Pacific Pte. Ltd. ("GAP") (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

**PLEASE TAKE NOTICE** that, on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC and its affiliates Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors," and the cases, the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on November 28, 2023, the Debtors filed the *Debtors' Motion for Entry of (I) Consent Judgment Against the DCG Parties and (II) Order Authorizing, to the Extent Necessary, GGC to Take Actions in Furtherance of the Partial Repayment Agreement Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, or, in the Alternative, Bankruptcy Rule 9019(a)* (the "Motion"). A hearing (the "Hearing") on the Motion will be held via Zoom on **December 13, 2023 at 2:00 p.m. (Prevailing Eastern Time)** before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections, if any, to entry of the final order shall be (a) filed with the Bankruptcy Court no later than **December 6, 2023 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline") and (b) served as required by the Order Implementing Certain Notice and Case Management Procedures, ECF No. 44 (the "Case Management Order").

**PLEASE TAKE FURTHER NOTICE** that, if no written objections are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court orders substantially in the forms annexed thereto as **Exhibit D** and **Exhibit E** to the Motion, which orders the Court may enter with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained (i) by accessing the Court's website at www.nysb.uscourts.gov (PACER password required) or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, which maintains a website at https://restructuring.ra.kroll.com/genesis or by calling +1 888 524 2017.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may affect your rights. Please read the Motion carefully and, if you have one available, discuss it with your attorney. (If you do not have an attorney, you should consider consulting with one.)

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Motion, or if you want the Court to hear your position on the Motion, then you or your attorney must attend the Hearing. If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Motion and may enter orders granting the relief requested by the Debtors.

Dated:    November 28, 2023
        New York, New York

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and
Debtors-in-Possession*

**Hearing Date and Time: December 13, 2023 at 2:00 p.m. (ET)**
**Objection Deadline: December 6, 2023 at 4:00 p.m. (ET)**

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| Genesis Global Capital, LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>Digital Currency Group, Inc.,<br><br>          Defendant. | Adv. Proc. No. 23-01168 (SHL) |

**DEBTORS' MOTION FOR ENTRY OF (I) CONSENT JUDGMENT
AGAINST THE DCG PARTIES AND (II) ORDER AUTHORIZING, TO THE EXTENT
NECESSARY, GGC TO TAKE ACTIONS IN FURTHERANCE OF THE PARTIAL
REPAYMENT AGREEMENT PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE
BANKRUPTCY CODE, OR, IN THE ALTERNATIVE, BANKRUPTCY RULE 9019(a)**

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC ("Holdco") (8219); Genesis Global Capital, LLC ("GGC") (8564); and Genesis Asia Pacific Pte. Ltd. ("GAP") (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 4

I.      The Master Loan Agreements........................................................................... 4

II.     The Chapter 11 Cases and Creditor Negotiations.............................................. 5

III.    The Original Partial Repayment Agreement....................................................... 7

IV.     The Partial Repayment Agreement ................................................................... 8

Jurisdiction and Venue...................................................................................................... 10

Relief Requested .............................................................................................................. 10

BASIS FOR RELIEF ........................................................................................................ 11

I.      Entry of the Consent Judgment is Appropriate................................................... 11

II.     The Court Should Authorize, to the Extent Necessary, the Debtors
        to Act in Furtherance of the Partial Repayment Agreement Under
        Sections 105(a) and 363(b) of the Bankruptcy Code............................................ 11

        A.      Acting in Furtherance of the Partial Repayment Agreement
                is Supported by the Debtors' Sound Business Judgment............................ 12

        B.      The Court Should Approve Debtors' Actions Taken in
                Furtherance of the Partial Repayment Agreement Pursuant
                to Its Equitable Powers Under Section 105(a) of the
                Bankruptcy Code. ................................................................... 15

III.    In the Alternative, the Debtors Are Authorized Pursuant to
        Bankruptcy Rule 9019(a) to Settle Claims and Perform Obligations
        Under the Partial Repayment Agreement. ............................................................ 16

CONCLUSION.................................................................................................................. 20

REQUEST FOR WAIVER OF STAY ............................................................................... 20

NOTICE............................................................................................................................ 20

CONCLUSION.................................................................................................................. 21

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983)..............................................................................12

*Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.)*,
   52 F.3d 41 (2d Cir. 1995) ...................................................................................15

*In re 8 W. 58TH St. Hosp., LLC*,
   No. 14-11524 (SHL), 2017 WL 3575856 (Bankr. S.D.N.Y. Aug. 4, 2017)...............12

*In re AMR Corp.*,
   485 B.R. 279 (Bankr. S.D.N.Y.) (SHL), *aff'd*, 730 F.3d 88 (2d Cir. 2013).................12

*In re Frost Bros., Inc.*,
   No. 91 Civ. 5244 (PNL), 1992 U.S. Dist. LEXIS 18301 (S.D.N.Y. Nov. 30, 1992) ...17

*In re Neshaminy Off. Bldg. Assocs.*,
   62 B.R. 798 (E.D. Pa. 1986) ................................................................................17

*In re Purofied Down Prods. Corp.*,
   150 B.R. 519 (S.D.N.Y. 1993)........................................................................16, 17

*In re Raytech Corp.*,
   190 B.R. 149 (Bankr. D. Conn. 1995) ..................................................................15

*In re Roman Cath. Diocese of Rockville Ctr.*,
   647 B.R. 69 (Bankr. S.D.N.Y. 2022)...............................................................12, 13

*In re Soundview Elite Ltd.*,
   565 B.R. 534 (Bankr. S.D.N.Y. 2017)...................................................................12

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983)................................................................................17

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
   25 F.3d 1132 (2d Cir. 1994) ...............................................................................15

**Page(s)**

*Nellis v. Shugrue*,
  165 B.R. 115 (S.D.N.Y. 1994) ..................................................................... 17

*U.S. v. Energy Res. Co.*,
  495 U.S. 545 (1990) ........................................................................................ 16

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
  134 B.R. 499 (Bankr. S.D.N.Y. 1991) ......................................................... 16

**Rules and Statutes**

11 U.S.C. § 363 .................................................................................................. *passim*

28 U.S.C. § 157 .................................................................................................. 10

28 U.S.C. § 1334 ............................................................................................... 10

28 U.S.C. § 1408 ............................................................................................... 10

28 U.S.C. § 1409 ............................................................................................... 10

28 U.S.C. § 105 .................................................................................................. *passim*

**Other Authorities**

Fed. R. Bankr. P. 2002 .................................................................................... 10

Fed. R. Bankr. P. 9019 .................................................................................... *passim*

Fed. R. Bankr. P. 6004 .................................................................................... *passim*

Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors Genesis Global

Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd. ("GAP", and together with GGC and

Holdco, the "Debtors"), as debtors and debtors-in-possession in the above-captioned cases (the

"Chapter 11 Cases"), hereby submit this motion (the "Motion") for entry of (i) a stipulated order

and judgment against Digital Currency Group, Inc. ("DCG"), attached hereto as **Exhibit D** (the

"Consent Judgment"), and (ii) an order, substantially in the form attached hereto as **Exhibit E**,

authorizing, to the extent necessary, GGC to take actions in furtherance of that certain Partial

Repayment Agreement, attached hereto as **Exhibit B** (the "Original Partial Repayment

Agreement"), as amended by the amendment attached hereto as **Exhibit C** (the "Amendment,"

and the agreement as amended, the "Partial Repayment Agreement"), among GGC, DCG, and

DCG International Investments Ltd. ("DCGI," and together with DCG, the "DCG Parties"),

pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§

101-1532 (the "Bankruptcy Code"), or in the alternative, rule 9019(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  In support of this Motion, the Debtors rely

upon the *Declaration of Thomas Conheeney in Support of Debtors' Motion for Entry of (I)*

*Consent Judgment Against the DCG Parties and (II) Order Authorizing, to the Extent Necessary,*

*GGC to Take Actions in Furtherance of the Partial Repayment Agreement Pursuant to Sections*

*105(a) and 363(b) of the Bankruptcy Code, or, in the Alternative, Bankruptcy Rule 9019(a)* (the

"Conheeney Declaration").

## PRELIMINARY STATEMENT[1]

1.      As of the Petition Date, the Debtors' corporate parent, DCG, owed GGC

approximately $500 million in outstanding principal amounts on account of unsecured loans

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them elsewhere in this Motion, the Original Partial Repayment Agreement or the Partial Repayment Agreement, as applicable.

issued to DCG by GGC pursuant to that certain DCG MLA, which loans became due and payable in May 2023.  Further, as of the Petition Date, DCG affiliate, DCGI, owed GGC 4,550.45173345 BTC and 14,048 BCH in outstanding principal amounts on accounts of unsecured loans issued to DCGI by GGC pursuant to that certain DCGI MLA, which loans also became due and payable in May 2023 (collectively, including the DCG and DCGI loans, the "DCG/DCGI Loans").  After the DCG/DCGI Loans were not paid at maturity, GGC sent a notice of default and reserved all of its rights and remedies for nonpayment.  DCG and DCGI sent a notice to GGC likewise reserving all of their rights and remedies including, among other things, their rights to dispute interest owed under the DCG/DCGI Loans and the outstanding principal amount due under the DCG MLA in light of a setoff DCG effectuated in December 2022.[2]

2.       At the time of the default, the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group"), and the DCG Parties were engaged in a mediation overseen by former Bankruptcy Judge Randall Newsome.  In connection with the mediation, the Debtors, the Creditors' Committee, and DCG negotiated an Agreement in Principle, subject to definitive documentation and continued negotiation over the terms and conditions of an amended chapter 11 plan, as described in a presentation filed with the Court on August 29, 2023 [ECF No. 625].  The Agreement in Principle included, among other things, the principal terms of an agreement by which GGC would forbear from exercising its right to take action with respect to the defaulted DCG/DCGI Loans.

---

[2]       On November 16, 2022, DCG asserts that it paid Luno Australia Pty Ltd. certain amounts owed to Luno by GGC on behalf of GGC, as identified in that certain Notice of Setoff, dated December 15, 2022, in connection with that certain Limited Guaranty between DCG and Luno and any interest accrued on the setoff amount that has been paid by DCG to GGC (the "Luno Setoff").  DCG and GGC have reserved all rights with respect to the Luno Setoff.

3.     On September 6, 2023, GGC filed the Turnover Actions, seeking to recover all amounts then-owed under the DCG/DCGI Loans.  Shortly thereafter, GGC entered into the Original Partial Repayment Agreement, pursuant to which the DCG Parties stipulated to the outstanding amounts under the DCG/DCGI Loans, agreed to a repayment schedule, paid a forbearance fee of approximately $2.3 million (to be credited against amounts owed to GGC under the Loans), and agreed to certain covenants, including restrictions on the payment of dividends, incurrence of liens, and asset sales.  In connection with the Original Partial Repayment Agreement, the DCG Parties have made payments to date totaling approximately $227 million.

4.     As the Debtors approached the date on which they asserted they had a right to terminate the Original Partial Repayment Agreement due to the abandonment of the Agreement in Principle, the Debtors began discussing with the DCG Parties the terms and conditions of a potential amendment to the Original Partial Repayment Agreement, with a goal of improving the terms and obtaining repayment in full of all amounts sought in the Turnover Actions.  Although the Debtors believed they had a right to terminate the Original Partial Repayment Agreement,[3] they determined that amending the agreement would be more beneficial to the estates than terminating it, primarily because the continuation of the agreement would allow the Debtors to retain the benefit of various covenants embedded in the Original Partial Repayment Agreement. Over the course of several weeks, the Debtors, led by Tom Conheeney (a member of the Special Committee) and the Debtors' legal counsel, Cleary Gottlieb, negotiated the Amendment.

5.     Under the terms of the Amendment, the DCG Parties agreed to a number of changes favorable to the Debtors' estates, including (i) a modified repayment schedule with an

---

[3]     DCG disputes any assertion that the Debtors had the right to terminate the Original Partial Repayment Agreement.

upfront payment and continuing monthly payments to GGC; (ii) a waiver of the $10 million hold back with respect to the CoinDesk sale proceeds that had been included in the Original Partial Repayment Agreement; (iii) the removal of the Forbearance Fee Crediting Provision; (iv) the pledging of certain specified Grayscale Ethereum Trust and Grayscale Ethereum Classic Trust shares as credit support; (v) a requirement that all amounts sought in the Turnover Actions be paid by April 1, 2024; (vi) immediate entry into the Consent Judgments for the full amounts sought in the Turnover Actions; and (vii) continuation of all of the covenants in the Original Partial Repayment Agreement.  In exchange, GGC agreed to forbear from seeking execution on the Consent Judgments unless the DCG Parties default under the Partial Repayment Agreement as more fully set forth in the Partial Repayment Agreement.

6.      By this Motion, the Debtors seek entry by this Court of the Consent Judgment attached hereto as **Exhibit D**, which awards GGC a judgment against DCG for the DCG Judgment Amount (as defined in the Consent Judgment).  In addition, although the Debtors believe that GGC has the inherent authority to take actions in furtherance of the Partial Repayment Agreement without Court approval, out of an abundance of caution and at the request of the Creditors' Committee and the Ad Hoc Group, the Debtors seek authority of this Court, to the extent required, to take actions in furtherance of the Partial Repayment Agreement.

## BACKGROUND

### I.    The Master Loan Agreements

7.      On November 10, 2022, GGC, as lender, and DCG, as borrower, entered into that certain Amended and Restated Master Loan Agreement (the "DCG MLA").  Pursuant to the DCG MLA, GGC extended certain loans to DCG (the "DCG Loans") in the principal aggregate amount of $500,000,000, of which the Debtors assert $324,500,000 remains outstanding, due, and payable (the "Undisputed DCG Amount").  DCG's asserted outstanding, due, and payable

amount reflects full credit for the Luno Setoff, which the Debtors dispute.  Notwithstanding the dispute between the parties regarding the outstanding amount principal amount owed on the DCG Loans, for purposes of the Partial Repayment Agreement, the parties have agreed to adopt the Undisputed Amounts (as defined herein), subject to a full reservation of rights on the Luno Setoff.  In addition to the principal amounts outstanding under the DCG Loans, it is GGC's position, as set forth in the Partial Repayment Agreement, that certain additional amounts are due and owing pursuant to the DCG MLAs, namely certain Late Fees and enforcement costs relating to the DCG/DCGI Loans (such amounts, the "Disputed DCG Amounts").

8.       On June 21, 2019, GGC, as lender, and DCGI, as borrower, entered into that certain Master Loan Agreement (the "DCGI MLA" and together with the DCG MLA, the "MLAs").  Pursuant to the DCGI MLA, GGC extended certain loans to DCGI (the "DCGI Loans") in the principal aggregate amount of 4,550.45173345 BTC and 14,048 BCH , of which 2,737.77102141 BTC and 14,048 BCH remain outstanding, due, and payable (the "Undisputed DCGI Amounts" and together with the Undisputed DCG Amounts, the "Undisputed Amounts"). In addition to the principal amounts outstanding under the DCGI Loans, it is GGC's view, as set forth in the Partial Repayment Agreement, that certain additional amounts are due and owing pursuant to the DCGI MLA, namely certain enforcement costs (such amounts, the "Disputed DCGI Amounts" and together with the Disputed DCG Amounts, the "Disputed Amounts").

## II.    The Chapter 11 Cases and Creditor Negotiations

9.       In the months leading up to the bankruptcy filing, the digital asset industry experienced tremendous dislocation, stemming from drastic market shifts and decreased investor confidence in the digital asset markets, which severely and adversely impacted the Debtors' business.  On November 16, 2022, GGC announced a freeze of withdrawals of all assets.

10.    After determining that an in-court process was the best path to continue efforts to
reach a consensual resolution to maximize value for the Debtors' stakeholders, on January 19,
2023, GGC, along with debtor affiliates Holdco and GAP, commenced their Chapter 11 Cases.

11.    In the months following the Petition Date, the Debtors and their advisors engaged
in extensive negotiations with various advisors to creditor groups, including the Creditors'
Committee, the Ad Hoc Group, Gemini Trust Company, Inc. ("Gemini"), and the DCG Parties to
explore strategic solutions and reach a consensual resolution to these proceedings.  While these
negotiations proved productive in narrowing the scope of issues between the various parties, no
global resolution has been reached.

12.    Nevertheless, the Debtors continued conversations with each creditor group—
individually and collectively—to advance these Chapter 11 Cases and confirm a chapter 11 plan.
As a result, on August 29, 2023, the Debtors, the Creditors' Committee, and DCG announced an
agreement in principle as set forth in that certain *Public Update on Plan Discussions* (the
"Agreement in Principle"), annexed to the Debtors' *Notice of Mediation Termination* [ECF No.
625].

13.    Due in large part to the impact of the New York State Attorney General's
complaint against the Debtors, DCG, Gemini and other parties, the Debtors pivoted away from
the Agreement in Principle and are now pursuing the "No Deal Plan" that seeks to distribute the
Debtors' available assets and pursue various litigation claims against DCG, Gemini and their
various affiliates.

## III.    The Original Partial Repayment Agreement

14.    On September 6, 2023, GGC filed (i) a complaint in the adversary proceeding
captioned Genesis Global Capital, LLC, v. Digital Currency Group, Inc., Adv. Pro. No. 23-

01168 (SHL) (the "DCG Turnover Action"), seeking turnover of all Undisputed DCG Amounts,

and (ii) a complaint in the adversary proceeding captioned Genesis Global Capital, LLC, v. DCG

International Investments, Ltd., Adv. Pro. No. 23-01169 (SHL) (the "DCGI Turnover Action,"

and together with the DCG Turnover Action, the "Turnover Actions") seeking turnover of all

Undisputed DCGI Amounts.

15.     On September 12, 2023, GGC and the DCG Parties (each a "Party," and together

the "Parties") entered into the Original Partial Repayment Agreement, attached hereto as **Exhibit**

**B**, pursuant to which the DCG Parties (i) stipulated to certain then-outstanding amounts under

the DCG/DCGI Loans; (ii) agreed that the DCG Parties would make periodic payments on

specified terms to repay the Undisputed Amounts, (iii) agreed that the DCG Parties would pay a

forbearance fee of approximately $2.3 million, to be credited against amounts owed to GGC

under the DCG Loans (the "Forbearance Fee Crediting Provision"); and (iv) agreed to certain

negative covenants, including restrictions on the DCG Parties' ability to pay dividends, incur

indebtedness and grant liens and certain affirmative covenants, including an obligation to turn

over proceeds from the sale of assets, subject to certain limitations.  Conheeney Declaration ¶ 7.

In exchange, and subject to certain terms and conditions, GGC agreed to forbear from exercising

rights against the DCG Parties, including a voluntary stay of the prosecution of the Turnover

Actions unless a DCG Party defaulted on its obligations under the Original Partial Repayment

Agreement.  *Id*.

16.     The economic terms of the Original Partial Repayment Agreement, including the

payment schedule and the Forbearance Fee Crediting Provision, were substantially similar to the

forbearance arrangement that certain creditors and DCG had negotiated during their discussions

over the summer of 2023, culminating in the announcement of the Agreement in Principle. Conheeney Declaration ¶ 8.

17.     The Original Partial Repayment Agreement also included additional terms and conditions that were not part of the Agreement in Principle.  For example, unlike the Agreement in Principle, the Original Partial Repayment Agreement (i) required the DCG Parties to start making payments immediately, rather than delaying such payments until entry into the Global Restructuring Agreement among the Debtors, the DCG Parties and other key stakeholders, and (ii) allowed GGC to terminate the Original Partial Repayment Agreement in the exercise of its fiduciary duties.  Conheeney Declaration ¶ 9.

18.     In accordance with the terms of the Original Partial Repayment Agreement, the DCG Parties made payments totaling approximately $227 million in connection with the Partial Repayment Agreement.  Conheeney Declaration ¶ 10; see also DCG Turnover Action, ECF Nos. 4-6; DCGI Turnover Action, ECF Nos. 7-9.

**IV.     The Partial Repayment Agreement**

19.     As part of ongoing discussions concerning the terms and conditions of a potential amendment to the Original Partial Repayment Agreement, the Debtors sought information from the DCG Parties about their ongoing liquidity and ability to pay amounts due under the DCG/DCGI Loans.  Conheeney Declaration ¶ 11.  Among other things, the Debtors and their advisors obtained on a confidential basis balance sheet and other financial information from the DCG Parties, which the Debtors shared subject to existing confidentiality agreements with professionals advising the Creditors' Committee in real time.  Ultimately, the information was shared subject to confidentiality agreements with members of the Creditors' Committee and the Ad Hoc Group on November 21, 2023.  *Id*.

20.      As of October 29, 2023, the Global Restructuring Agreement had not been

executed, and the Debtors had not filed an amended chapter 11 plan and disclosure statement

consistent with the Agreement in Principle.  Conheeney Declaration ¶ 12.  As such, it is GGC's

position that each of GGC and the DCG Parties was, as of October 29, 2023, entitled to terminate

the Original Partial Repayment Agreement.  *Id.*  Termination of the Original Partial Repayment

Agreement would have allowed GGC to re-commence the Turnover Actions, but would have

also relieved the DCG Parties from complying with the affirmative and negative covenants

imposed on each of the DCG Parties by the Original Partial Repayment Agreement.  Rather than

immediately exercise GGC's right to terminate, the Special Committee of the Board of Directors

of Genesis Global Holdco, LLC (the "Special Committee") made the decision, after consultation

with the Debtors' advisors, to retain the favorable contractual restrictions of the Original Partial

Repayment Agreement and continue to negotiate additional protections through an amendment

to the Original Partial Repayment Agreement.  *Id.*

21.      In connection with negotiations and to solicit input from creditor constituencies,

the Special Committee met with members of the Creditors' Committee and its advisors on

November 2, 2023, and met with members of the Creditors' Committee, the Ad Hoc Group and

their respective advisors on November 22, 2023.  The Debtors' advisors also had numerous

discussions about the Partial Repayment Agreement with the advisors to the Creditors'

Committee and Ad Hoc Group over the past few weeks prior to the filing of this Motion.

Conheeney Declaration ¶ 13.

22.      On November 28, 2023, GGC and the DCG Parties entered into that certain

Partial Repayment Agreement, as amended, pursuant to which the parties (i) further stipulated to

certain presently-outstanding amounts under the DCG/DCGI Loans; (ii) agreed on a modified

schedule by which the DCG Parties would make periodic payments on specified terms to repay

the Undisputed Amounts; (iii) agreed to eliminate the Forbearance Fee Crediting Provision, (iv)

agreed to remove the right to withhold $10 million in proceeds from the sale of CoinDesk; (v)

agreed to repay all Undisputed Amounts by no later than April 1, 2024, and (vi) agreed to entry

of the Consent Judgment, attached hereto as **Exhibit D**, and a similar Consent Judgment against

DCGI for the full payment of the Undisputed Amounts.  In exchange, GGC agreed to forbear

from executing on the Consent Judgments except upon the occurrence of a default or termination

event pursuant to the terms of the Partial Repayment Agreement.

## JURISDICTION AND VENUE

23.    The United States Bankruptcy Court for the Southern District of New York (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent

with Article III of the United States Constitution.

24.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

25.    The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9019(a).

## RELIEF REQUESTED

26.    By this Motion, the Debtors request (i) entry of the Consent Judgment

substantially in the form attached hereto as **Exhibit D** for the full payment of the Undisputed

DCG Amounts in accordance with the terms of the Partial Repayment Agreement, and (ii) entry

of an order substantially in the form attached hereto as **Exhibit E**, pursuant to sections 105(a)

and 363(b) of the Bankruptcy Code, or in the alternative, Bankruptcy Rule 9019(a), authorizing

GGC, to the extent required, to take actions in furtherance of the Partial Repayment Agreement (together, the "Proposed Orders").

## BASIS FOR RELIEF

**I.   Entry of the Consent Judgment is Appropriate.**

27.   As contemplated by the Partial Repayment Agreement, (i) GGC and the DCG Parties executed, and consented to entry of, the Consent Judgments, and (ii) GGC agreed to forbear from seeking execution of the Consent Judgments except upon the occurrence of a default or termination event as set forth in the Partial Repayment Agreement.  As such, the Debtors respectfully request entry of the Consent Judgment attached hereto as **Exhibit D**.  As stated in the Partial Repayment Agreement and in the Consent Judgments signed by the DCG Parties and filed with the Court, the DCG Parties have consented to entry of the Consent Judgments.

**II.   The Court Should Authorize, to the Extent Necessary, the Debtors to Act in Furtherance of the Partial Repayment Agreement Under Sections 105(a) and 363(b) of the Bankruptcy Code.**

28.   The Debtors believe that GGC is authorized to take actions in furtherance of the Partial Repayment Agreement without Court approval.  Nonetheless, out of an abundance of caution and at the request of the Creditors' Committee and the Ad Hoc Group, the Debtors seek authority of this Court, to the extent required, to take actions in furtherance of the Partial Repayment Agreement.

### A.   Acting in Furtherance of the Partial Repayment Agreement is Supported by the Debtors' Sound Business Judgment.

29.   A debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b); *see also* Fed. R. Bankr. P. 6004 (detailing the procedures by which a debtor may use, sell, or lease estate property

outside of the ordinary course of its business).  Courts consistently hold that a cause of action

held by the debtor constitutes property of the estate.  *See In re Soundview Elite Ltd.*, 565 B.R.

534, 543–44 (Bankr. S.D.N.Y. 2017) ("The Bankruptcy Code defines 'property' of a debtor's

estate to include 'all legal or equitable interests of the debtor in property as of the

commencement of the case,' . . . includ[ing] 'the estate's causes of action.'" (first quoting 11

U.S.C. § 541(a)(1); then quoting *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458

B.R. 87, 123 (Bankr. S.D.N.Y. 2011)).

      30.     When performing an analysis under section 363(b), courts in the Second Circuit

and elsewhere have ruled that a debtor's decision to use estate property must be supported by the

debtor's sound business judgment.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that, when determining an application to

"use" assets under section 363(b), a judge must find from the evidence presented a good business

reason to grant such application); *In re Roman Cath. Diocese of Rockville Ctr.*, 647 B.R. 69, 75

(Bankr. S.D.N.Y. 2022) (same); *In re AMR Corp.*, 485 B.R. 279, 287–88 (Bankr. S.D.N.Y.)

(SHL), *aff'd*, 730 F.3d 88 (2d Cir. 2013) (applying the sound business judgment standard to a

debtor's request to use estate assets pursuant to § 363(b)).  Once a debtor sets forth a good

business reason for the use of property under review, there "is a presumption that in making a

business decision the [debtor] acted on an informed basis, in good faith and in the honest belief

that the action taken was in the best interests of the company."  *In re 8 W. 58TH St. Hosp., LLC,*

No. 14-11524 (SHL), 2017 WL 3575856, at *3 (Bankr. S.D.N.Y. Aug. 4, 2017) (internal

quotations omitted).  This analysis applies where the proposed use of assets involves claims and

causes of action held by a debtor.  *See, e.g.*, *In re Roman Cath. Diocese of Rockville Ctr.*, 647

B.R. at 76 (finding debtor exercised reasonable business judgment under § 363(b) where it

surrendered insurance rights and other indemnification claims in exchange for receiving releases from sexual abuse claims).

31.     Here, the Debtors' decision to act in furtherance of the Partial Repayment Agreement rather than immediately move to prosecute the Turnover Actions is well-supported by the Debtors' sound business judgment.  In particular, the terms of the Partial Repayment Agreement provide immediate significant and near-term benefits to GGC and its creditors, as compared to the risks associated with the termination of the Original Partial Repayment Agreement and prosecution of the Turnover Actions.  Conheeney Declaration ¶ 15.

32.     *First*, as amended, the Partial Repayment Agreement provides that GGC will receive a stream of payments and a pledge of collateral by DCG and DCGI, resulting in a full repayment of all Undisputed Amounts by April 1, 2024.  Specifically, the Debtors will receive over $200 million in value by January 5, 2024 pursuant to the terms of the Partial Repayment Agreement, thereby reducing the Debtors' exposure to DCG in the near term.  Conheeney Declaration ¶ 16.

33.     *Second*, the Partial Repayment Agreement eliminates the need for litigation of the Turnover Actions.  Although GGC believes that its likelihood of success in the Turnover Actions is assured, litigating those actions would take time, including potential efforts by the DCG Parties to pursue discovery, counterclaims, and possibly appeals.  *Id.* at ¶ 17.  Litigation of the Turnover Actions would also drain estate resources through ongoing expenditure of legal fees.  *Id.*  By virtue of the Partial Repayment Agreement, GGC will obtain entry by this Court of the Consent Judgments against the DCG Parties for the full Undisputed Amounts due and owing pursuant to the DCG/DCGI Loans—i.e., the same amounts sought by the Turnover Actions.  *Id.*  In the event of a nonpayment or other default under the Partial Repayment Agreement by either

of the DCG Parties, GGC will have the right to execute on the Consent Judgments to collect the full amounts sought under the Turnover Actions. *Id.*

34.     ***Third***, as a result of the Amendment, the DCG Parties will continue to be bound by the covenants of the Original Partial Repayment Agreement, including those related to prohibitions on the payment of dividends, limitations on the incurrence of indebtedness and liens, and the obligation to turn over proceeds from extraordinary sales. *Id.* at ¶ 18. These provisions will ensure that the DCG Parties are focused on repaying GGC and will further de-risk the estates' exposure to the DCG Parties. *Id.* Given the uncertainty facing the DCG Parties, including as a result of the New York Attorney General's complaint seeking an order requiring DCG to cease doing business in New York, as well as the inherent volatility in the cryptocurrency industry, reducing risk and obtaining payment in short order is extremely important to the Special Committee. *Id.*

35.     ***Fourth***, on the basis of cash flow and balance sheet information obtained from the DCG Parties, the Special Committee believes that the DCG Parties are not in a position to immediately repay in full the Undisputed Amounts. *Id.* at ¶ 19. Any immediate judgment on the Turnover Actions could have a value-destructive impact on one or both of the DCG Parties. This would, at a minimum, put at risk or further delay GGC's receipt of additional payments on the DCG/DCGI Loans, complicate these Chapter 11 Cases, and cause GGC to incur significant legal costs. *Id.* Therefore, if GGC continued to pursue the Turnover Actions, it could force the DCG Parties to obtain immediate financing to repay the Undisputed Amounts. *Id.* Any such refinancing would require the DCG Parties to pay significant commitment fees, pay high interest rates and agree to onerous contractual limitations that would benefit DCG's new secured lenders to the disadvantage of the Debtors' estates. *Id.* In addition, it would entail the granting of liens

and encumbrances that would be superior to GGC's unsecured claims, and bring a new party to

the table (i.e., DCG's new secured lender) that could impose restrictive covenants and consent

rights over any consensual resolution with the Debtors' estates.  *Id*.  By contrast, the amounts

agreed to be paid under the Partial Repayment Agreement's payment provisions are reasonable

and consistent with what the Special Committee believes that the DCG Parties can pay, while

allowing DCG to continue to generate revenues that can be put toward further payments to GGC.

*Id.*

       **B.**    **The Court Should Approve Debtors' Actions Taken in Furtherance of
the Partial Repayment Agreement Pursuant to Its Equitable Powers Under
Section 105(a) of the Bankruptcy Code.**

      36.    Under section 105 of the Bankruptcy Code, the Court has broad discretion to

"carry out the provisions of this title."  11 U.S.C. § 105(a); *see also Croton River Club, Inc. v.*

*Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.)*, 52 F.3d 41, 45 (2d Cir.

1995) (holding that bankruptcy courts have broad equity power to manage the affairs of debtors);

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132,

1136 (2d Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke equitable

principles to achieve fairness and justice in the reorganization process.");  *In re Raytech Corp.*,

190 B.R. 149, 151 (Bankr. D. Conn. 1995) (noting, while considering the debtor's motion to

"use" assets pursuant to section 363(b), that "[a] bankruptcy judge must have substantial freedom

to tailor his orders to meet differing circumstances" (quoting *In re Lionel Corp.*, 722 F.2d at

1069)).

      37.    The purpose of section 105(a) is "to assure the bankruptcy courts power to take

whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2 Collier

on Bankruptcy ¶ 105.01 (16th ed. 2023).  Such power conforms to the Court's inherent equitable

authority.  *See*, *e.g.*, *U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).  The relief requested

herein is both necessary and appropriate to allow the Debtors to take significant steps forward in

resolving disputes between GGC, the Debtors' parent company, DCG, and its affiliate, DCGI,

regarding the Undisputed Amounts.  Accordingly, the Court should (i) enter the Consent

Judgment and (ii) to the extent necessary, authorize GGC to take any other actions in furtherance

of the Partial Repayment Agreement.

**III.    In the Alternative, the Debtors Are Authorized Pursuant to Bankruptcy Rule
9019(a) to Settle Claims and Perform Obligations Under the Partial Repayment
Agreement.**

38.    Bankruptcy Rule 9019(a) provides, in the relevant part, that "[o]n motion by the

[debtor in possession] and after notice and a hearing, the court may approve a compromise or

settlement."  Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve

compromises and settlements if they are in the best interests of the Estates."  V*aughn v. Drexel

Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505

(Bankr. S.D.N.Y. 1991).  Accordingly, in addition to sections 105(a) and 363(b), or in the

alternative, the Court is authorized to approve the Partial Repayment Agreement as a fair and

reasonable settlement under Bankruptcy Rule 9019(a).

39.    In order to approve a compromise or a settlement under Bankruptcy Rule 9019(a),

the bankruptcy court must find that the compromise or settlement is "in the best interests of the

estate."  *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 523 (S.D.N.Y. 1993) (citation

omitted).  In making this finding, the bankruptcy court should form an informed and independent

judgment as to whether a proposed compromise is in the best interests of the debtor's estate.  *Id.*

However, the settlement need not result in the best possible outcome for the debtor, and instead

only must not "fall below the lowest point in the range of reasonableness."  *In re Drexel

Burnham Lambert Grp., Inc.*, 134 B.R. at 505 (citation omitted).

40.     In determining whether a compromise or settlement should be approved under

Bankruptcy Rule 9019(a), the bankruptcy court should not substitute its own judgment for that of

the debtor.  *See In re Neshaminy Off. Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).  In fact,

the bankruptcy court may consider the opinions of the debtor-in-possession or the trustee that the

settlement is fair and reasonable.  *See Nellis v. Shugrue*, 165 B.R. 115, 122–23 (S.D.N.Y. 1994).

Furthermore, the bankruptcy court need not conduct a "mini-trial" to decide the numerous issues

of law and fact raised by the settlement, but rather must only "canvass the issues and see whether

the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *Purofied Down*

*Prods.*, 150 B.R. at 522 (citations omitted); *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d

Cir. 1983); *In re Frost Bros., Inc.*, No. 91 Civ. 5244 (PNL), 1992 U.S. Dist. LEXIS 18301, at

*16 (S.D.N.Y. Nov. 30, 1992).  This requirement "reflect[s] the considered judgment that little

would be saved by the settlement process if bankruptcy courts could approve settlements only

after an exhaustive investigation and determination of the underlying claims," *Purofied Down*

*Prods.*, 150 B.R. at 522–23, and the fact that settlements are "favored and, in fact, encouraged"

in bankruptcy.  *Nellis*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and,

in fact, encouraged by the approval process outlined above.").

41.     The Partial Repayment Agreement is the result of good faith and arm's length

negotiations between GGC and the DCG Parties, and is well within the range of reasonableness.

As already discussed herein, the Partial Repayment Agreement is the result of hard-fought

negotiations between the parties and features favorable contractual terms, including (i) a

repayment schedule providing for full repayment of the Undisputed Amounts by April 1, 2024;

(ii) Consent Judgments against the DCG Parties that may be executed if the DCG Parties default

on their obligations under the Partial Repayment Agreement; and (iii) continuing covenants.
Conheeney Declaration ¶ 14.

42.     Further, the Partial Repayment Agreement allows the Debtors to avoid costly and
time-consuming litigation associated with prosecuting the Turnover Actions, pursuant to which
the DCG Parties could seek discovery, and which cases themselves could result in appeals that
would take months, if not longer, to resolve.  Even if GGC were to continue to prosecute the
Turnover Actions, rather than entering into the Partial Repayment Agreement and Consent
Judgments, the Debtors might not reach final judgment in the Turnover Actions until after April
2024, especially if appeals were pursued.  Thus, entry into the Partial Repayment Agreement
would lead to a substantially similar result as would a successful litigation.  Conheeney
Declaration ¶ 17.  Moreover, the Partial Repayment Agreement minimizes the risk that DCG
Parties would need to seek refinancing of the DCG/DCGI Loans that would prejudice the
Debtors' estates.  Conheeney Declaration ¶ 18.

43.     Critically, the Partial Repayment Agreement provides for full payment of all
amounts sought in the Turnover Actions by April 1, 2024.  It also provides a key safety valve in
the form of the Consent Judgments, which GGC can immediately use to execute on the DCG
Parties' assets in the event of a default by the DCG Parties.  Conheeney Declaration ¶ 17.  On its
terms, if viewed as a settlement, the Partial Repayment Agreement represents a fair and
reasonable settlement of the Turnover Actions that is squarely in the best interest of the estate
and its creditors.

44.     Further, the Debtors' decision to enter into the Partial Repayment Agreement is
heavily informed by the Debtors' review of the DCG Parties' current financial information,

which leads the Debtors to believe that immediate payment in full by the DCG Parties is not practicable. Conheeney Declaration ¶¶ 11, 19.

45.     Finally, the Partial Repayment Agreement is the product of extensive arms' length negotiations among the Debtors and the DCG Parties and their respective advisors. The Partial Repayment Agreement is an exercise of the sound business judgment of the Debtors and has been approved by the Special Committee following consultation with the Debtors' legal and financial advisors, including a cost-benefit analysis of the costs and risks associated with litigating the Turnover Actions rather than entering into the Consent Judgments and repayment structure contemplated in the Partial Repayment Agreement. Conheeney Declaration ¶ 12. In addition, the Debtors and the Special Committee have kept the Creditors' Committee and Ad Hoc Group informed and solicited their input on the terms of the Partial Repayment Agreement, including attending meetings with creditor constituencies on November 2 and November 21, 2023. Conheeney Declaration ¶ 11. As a result, the Special Committee has concluded that the Partial Repayment Agreement is in the best interests of the Debtors' estates and their creditors. Conheeney Declaration ¶ 20.

46.     Based on the foregoing, the Partial Repayment Agreement is fair, equitable and reasonable, and constitutes a proper exercise of the Debtors' sound business judgment. Accordingly, in the event the Court does not approve the Motion pursuant to section 363(b), it should approve the Partial Repayment Agreement as a settlement under Bankruptcy Rule 9019(a).

## **CONCLUSION**

47.     The Debtors respectfully request that the Court (i) enter the Consent Judgment in the form attached hereto as **Exhibit D**, and (ii) to the extent required, authorize the Debtors to

take actions in furtherance of the Partial Repayment Agreement pursuant to sections 105(a) and
363(b) of the Bankruptcy Code, or, in the alternative, Bankruptcy Rule 9019(a), by entry of an
order substantially in the form attached hereto as **Exhibit E**.

## REQUEST FOR WAIVER OF STAY

48.     In the event the Court grants the relief requested pursuant to section 363(b) of the
Bankruptcy Code, as discussed herein, there are immediate and material benefits to the Debtors,
and immediate entry and implementation of the Order is of vital importance to the Debtors.  To
implement the foregoing successfully, the Debtors seek a waiver of the fourteen-day stay of an
order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) to the extent
that such rule applies.

## NOTICE

49.     The Debtors have provided notice of this Motion in accordance with the
procedures set forth in the *Order Implementing Certain Notice and Case Management
Procedures* [ECF No. 44].  The Debtors submit that, in light of the nature of the relief requested,
no other or further notice need be provided.

## NO PRIOR REQUEST

50.     No prior request for the relief requested herein has been made to this or any other
Court.

## **CONCLUSION**

WHEREFORE, for the reason set forth herein the Debtors respectfully request

that this Court (a) enter the Proposed Orders, substantially in the forms attached hereto as

**Exhibit D** and **Exhibit E**, and (b) grant such other and further relief as is just and proper.

| | | |
|---|---|---|
| Dated: | November 28, 2023<br>New York, New York | */s/ Sean A. O'Neal*<br>Sean A. O'Neal<br>Luke A. Barefoot<br>Jane VanLare<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br><br>*Counsel to the Debtors and*<br>*Debtors-in-Possession* |

## EXHIBIT A

**Conheeney Declaration**

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Genesis Global Holdco, LLC, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 23-10063 (SHL) |
| Genesis Global Capital, LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>Digital Currency Group, Inc.,<br><br>       Defendant. | Adv. Proc. No. 23-01168 (SHL) |

**DECLARATION OF THOMAS CONHEENEY IN SUPPORT OF
DEBTORS' MOTIONS FOR ENTRY OF (I) CONSENT JUDGMENT
AGAINST THE DCG PARTIES AND (II) ORDER AUTHORIZING, TO THE EXTENT
NECESSARY, GGC TO TAKE ACTIONS IN FURTHERANCE OF THE PARTIAL
REPAYMENT AGREEMENT PURSUANT TO SECTIONS 105(a) AND 363(b)  OF THE
BANKRUPTCY CODE, OR, IN THE ALTERNATIVE, BANKRUPTCY  RULE 9019(a)**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC ("Holdco") (8219); Genesis Global Capital, LLC ("GGC") (8564); and Genesis Asia Pacific Pte. Ltd. ("GAP") (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

I, Thomas Conheeney, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of (I) Consent Judgments Against the DCG Parties and (II) Order Authorizing, to the Extent Necessary, GGC to Take Actions in Furtherance of the Partial Repayment Agreement Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, or, in the Alternative, Bankruptcy Rule 9019(A)* (the "Motion").[2]

### A.    Background

2.      I am a member of the Special Committee of the Board of Directors (the "Special Committee") of Genesis Global Holdco, LLC, a limited liability company organized under the laws of Delaware ("Holdco"), which owns 100% of the interest in Genesis Global Capital, LLC ("GGC"), Genesis Asia Pacific Pte. Ltd. ("GAP") and Holdco's other, non-debtor subsidiaries.  I have held my current title since August 2022.

3.      I am generally familiar with the day-to-day operations and affairs of the Debtors and their subsidiaries (together with the Debtors, the "Genesis Entities").  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge attained while working with the Genesis Entities; my discussions with members of the Special Committee; discussions with other members of the Debtors' team and the Debtors' other advisors; my review of relevant documents; and my views based upon my professional experience.

4.      To the extent that the Debtors learn that any information provided herein is materially inaccurate, the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge, information and belief.  I

---

[2]      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

### B.    Maturity of the DCG Loans and the DCGI Loans

5.    I understand that, as of the Petition Date, the principal amounts outstanding, due, and owing by the DCG Parties to GGC under the DCG Loans and the DCGI Loans were approximately (i) $500 million and (ii) 4,550.45173345 BTC, and 14,048 BCH, pursuant to the DCG MLA and the DCGI MLA, respectively.

### C.    Filing of Turnover Actions

6.    On September 6, 2023, GGC commenced the Turnover Actions against DCG and DCGI, seeking to recover Undisputed Amounts owed to GGC by DCG and DCGI under the DCG Loans and the DCGI Loans, respectively.

### D.    Entry into Partial Repayment Agreement

7.    On September 12, 2023, GGC and the DCG Parties entered into the Original Partial Repayment Agreement, pursuant to which, among other things, the DCG Parties (i) stipulated to certain then-outstanding amounts under the DCG Loans and the DCGI Loans; (ii) agreed that the DCG Parties would make periodic payments on specified terms to repay the Undisputed Amounts; (iii) agreed that the DCG Parties would pay a forbearance fee of approximately $2.3 million, to be credited against amounts owed to GGC under the DCG Loans (the "Forbearance Fee Crediting Provision"); (iv) agreed to certain negative covenants, including restrictions on the DCG Parties' ability to pay dividends, incur indebtedness, and grant liens, and certain affirmative covenants, including an obligation to turn over proceeds from the sale of assets, subject to certain limitations; and (v) agreed that any Party would be permitted to terminate the Original Partial Repayment Agreement in the event that, by October 29, 2023, the Global Restructuring Agreement had not been executed, or the Debtors had not filed an amended chapter 11 plan and disclosure statement

consistent with the Agreement in Principle (as defined below).  In exchange, and subject to certain terms and conditions, GGC agreed to forbear from exercising rights against the DCG Parties, including a voluntary stay of the prosecution of the Turnover Actions unless a DCG Party defaulted on its obligations under the Original Partial Repayment Agreement.

8.      The economic terms of the Original Partial Repayment Agreement, including the payment schedule and the Forbearance Fee Crediting Provision, were substantially similar to the forbearance arrangement that the Debtors, the Creditors' Committee, and DCG had negotiated during their discussions over the summer of 2023, culminating in the announcement of an Agreement in Principle, dated August 29, 2023, annexed to the Debtors' *Notice of Mediation Termination* [ECF No. 625] (the "Agreement in Principle").

9.      The Original Partial Repayment Agreement also included additional terms and conditions that were not part of the Agreement in Principle.  For example, unlike the Agreement in Principle, the Original Partial Repayment Agreement (i) required the DCG Parties to start making payments immediately, rather than delaying such payments until entry into a definitive settlement agreement (the "Global Restructuring Agreement") among the Debtors, the DCG Parties and other key stakeholders, and (ii) allowed GGC to terminate the Original Partial Repayment Agreement in the exercise of its fiduciary duties.  *See* Sections 7(a)(viii) and 7(c) of the Original Partial Repayment Agreement.

10.     I understand that DCG Parties have made payments totaling approximately $227 million in connection with the Original Partial Repayment Agreement, thereby reducing GGC's credit risk to the DCG Parties and increasing assets available for distribution to the Debtors' creditors.

### E.    Negotiation of the Amendment

11.    As a member of the Special Committee, I was tasked with the responsibility of negotiating the terms and conditions of a potential amendment to the Original Partial Repayment Agreement.  On or about October 24, 2023, I began to have discussions with the DCG Parties about the Amendment.  As part of these discussions,  the Debtors sought information from the DCG Parties about their ongoing liquidity and ability to pay amounts due under the DCG Loans and the DCGI Loans.  Among other things, the Debtors and their advisors obtained on a confidential basis balance sheet and other financial information from the DCG Parties, which the Debtors shared subject to existing confidentiality agreements with professionals advising the Creditors' Committee in real time.  Ultimately, the information was shared subject to confidentiality agreements with members of the Creditors' Committee and the Ad Hoc Group on November 21, 2023.

12.    As of October 29, 2023, the Debtors had a right to terminate the Original Partial Repayment Agreement because the Global Restructuring Agreement had not been executed, and the Debtors had not filed an amended chapter 11 plan and disclosure statement consistent with the Agreement in Principle.  Termination of the Original Partial Repayment Agreement would have allowed GGC to re-commence the Turnover Actions, but would have also relieved the DCG Parties from complying with the affirmative and negative covenants imposed by the Original Partial Repayment Agreement.  The Special Committee made the decision, after consultation with the Debtors' advisors, to retain these favorable contractual restrictions and continue to negotiate additional protections through an amendment to the Original Partial Repayment Agreement.

13.    In connection with our negotiations and to solicit input from creditor constituencies, the Special Committee met with members of the Creditors' Committee and its advisors on November 2, 2023, and met with members of the Creditors' Committee, the Ad Hoc Group and

their respective advisors on November 22, 2023.  The Debtors' advisors also had numerous discussions about the Partial Repayment Agreement with the advisors to the Creditors' Committee and Ad Hoc Group over the past few weeks.

14.    These negotiations led to GGC and the DCG Parties' execution of the Amendment, pursuant to which the DCG Parties: (i) further stipulated to certain presently-outstanding amounts under the DCG Loans and the DCGI Loans; (ii) agreed on a modified schedule by which the DCG Parties would make periodic payments on specified terms to repay the Undisputed Amounts; (iii) agreed to eliminate the Forbearance Fee Crediting Provision; (iv) agreed to remove the right to withhold $10 million in proceeds from the sale of CoinDesk; (v) agreed to repay all Undisputed Amounts by no later than April 1, 2024; and (vi) agreed to entry of the Consent Judgments against the DCG Parties for the full payment of the Undisputed Amounts.  In exchange, GGC agreed to forbear from seeking execution of the Consent Judgments except upon the occurrence of a default or termination event pursuant to the terms of the Partial Repayment Agreement.

15.    I believe that the terms of the Amendment provide significant and near-term benefits to GGC and their creditors, compared to termination of the Original Partial Repayment Agreement or immediate prosecution of the Turnover Actions.

16.    **First**, as amended, the Partial Repayment Agreement provides that GGC will receive a stream of payments and a pledge of collateral by DCG and DCGI, resulting in a full repayment of all Undisputed Amounts by April 1, 2024.  Specifically, the Debtors will receive over $200 million in value by January 5, 2024 pursuant to the terms of the Partial Repayment Agreement, thereby reducing the Debtors' exposure to DCG in the near term.

17.    **Second**, the Partial Repayment Agreement eliminates the need for litigation of the Turnover Actions.  Although GGC believes that its likelihood of success in the Turnover Actions

is assured, litigating those actions would take time, including potential efforts by the DCG Parties to pursue discovery, counterclaims, and possibly appeals. Litigation of the Turnover Actions would also drain estate resources through ongoing expenditure of legal fees. By virtue of the Partial Repayment Agreement, GGC will obtain entry by this Court of the Consent Judgments against the DCG Parties for the full Undisputed Amounts due and owing pursuant to the Loans— i.e., the same amounts sought by the Turnover Actions. In the event of a nonpayment or other default under the Partial Repayment Agreement by either of the DCG Parties, GGC will have the right to execute on the Consent Judgments to collect the full amounts sought under the Turnover Actions. Even if GGC were to continue to prosecute the Turnover Actions, rather than entering into the Partial Repayment Agreement, the Debtors might not reach final judgment in the Turnover Actions until after April 2024, especially if appeals were pursued. Thus, entry into the Partial Repayment Agreement would lead to a substantially similar result as would a successful litigation.

18.     *Third*, as a result of the Amendment, the DCG Parties will continue to be bound by the covenants of the Original Partial Repayment Agreement, including those related to prohibitions on the payment of dividends, limitations on the incurrence of indebtedness and liens, and the obligation to turn over proceeds from extraordinary sales. These provisions will ensure that the DCG Parties are focused on repaying GCC and will further de-risk the estates' exposure to the DCG Parties. Given the uncertainty facing the DCG Parties, including as a result of the New York Attorney General's complaint seeking an order requiring DCG to cease doing business in New York, as well as the inherent volatility in the cryptocurrency industry, reducing risk and obtaining payment in short order is extremely important to the Special Committee.

19.     *Fourth*, on the basis of cash flow and balance sheet information obtained from the DCG Parties, the Special Committee believes that the DCG Parties are not in a position to

immediately repay in full the Undisputed Amounts.  Any immediate judgment on the Turnover Actions could have a value-destructive impact on one or both of the DCG Parties.  This would, at a minimum, put at risk or delay GGC's receipt of additional payments on the DCG/DCGI Loans, complicate these Chapter 11 Cases, and cause GGC to incur significant legal costs.  Therefore, if GGC continued to pursue the Turnover Actions, it could force the DCG Parties to obtain immediate financing to repay the Undisputed Amounts.  Any such refinancing would require the DCG Parties to pay significant commitment fees, pay high interest rates and agree to onerous contractual limitations that would benefit DCG's new secured lenders to the disadvantage of the Debtors' estates.  In addition, it would entail the granting of liens and encumbrances that would be superior to GGC's unsecured claims, and bring a new party to the table (i.e., DCG's new secured lender) that could impose restrictive covenants and consent rights over any consensual resolution with the Debtors' estates.  By contrast, the amounts agreed to be paid under the Partial Repayment Agreement's payment provisions are reasonable and consistent with what the Special Committee believes that the DCG Parties can pay, while allowing DCG to continue to generate revenues that can be put toward further payments to GGC.

20.     *Fifth*, entry into the Amendment will foster continued settlement discussions among the estates' key stakeholders, by allowing the parties to focus on a potential consensual resolution rather than immediate refinancing efforts or litigation which could impose significant impediments to a consensual resolution.

21.     In light of the foregoing, I believe the Amendment is fair and equitable, reasonable, and in the best interests of the Debtors' estates.

Dated:  November 28, 2023
        New York, New York

                                        /s/ Thomas Conheeney
                                        Thomas Conheeney
                                        Special Committee Member
                                        Genesis Global Holdco, LLC

**<u>EXHIBIT B</u>**
**Original Partial Repayment Agreement**

EXECUTED VERSION

## PARTIAL REPAYMENT AGREEMENT

This PARTIAL REPAYMENT AGREEMENT, dated as of September 12, 2023 (this "Agreement"), is entered into among Genesis Global Capital, LLC ("GGC"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 250 Park Avenue South, 5th Floor, New York, New York 10003, Digital Currency Group, Inc. ("DCG"), a Delaware corporation with its principal place of business at 290 Harbor Drive, 5th Floor, Stamford, Connecticut 06902, and DCG International Investments Ltd. ("DCGI", together with DCG, the "DCG Parties" and together with GGC, the "Parties"), a company incorporated in and existing under the laws of Bermuda, with its registered office at Century House, 16 Par-la-Ville Road, Pembroke, HM 08, Hamilton, Bermuda.  All capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the DCG MLA (as defined below) or the DCGI MLA (as defined below), as applicable.

## RECITALS:

WHEREAS, reference is made to (i) that certain Amended and Restated Master Loan Agreement, dated as of November 10, 2022 (the "DCG MLA"), by and between GGC, as Lender, and DCG, as Borrower and (ii) that certain Master Loan Agreement, dated as of June 21, 2019 (the "DCGI MLA" and, together with the DCG MLA, the "MLAs"), by and between GGC, as Lender, and DCGI, as Borrower).

WHEREAS, under the DCG MLA, the following Loans are currently outstanding:

(i)      that certain loan dated January 24, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "January 24 Loan");

(ii)     that certain loan dated February 23, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "February 23 Loan");

(iii)    that certain loan dated May 9, 2022, with a principal amount equal to $200,000,000 (the "May 9 Loan"); and

(iv)     that certain loan dated May 10, 2022, with a principal amount equal to $100,000,000 (the "May 10 Loan" and together with the January 24 Loan, the February 23 Loan, and the May 9 Loan, the "DCG Loans").

WHEREAS, under the DCGI MLA, that certain loan dated June 22, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to 4,550.45173345 BTC (the "June 22 Loan"), is currently outstanding.

WHEREAS, under the DCGI MLA, that certain term loan dated September 21, 2020, and that certain term loan dated December 21, 2020 with a cumulative principal amount equal to 14,048 BCH (the "BCH Loan" and, together with the June 22 Loans, the "DCGI Loans") are currently outstanding.

WHEREAS, as of the date hereof, the following Events of Default (collectively, the "Specified Admitted Events of Default") under the MLAs, as applicable, have occurred and are continuing:

    (i)    an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to return any and all Loaned Assets outstanding under the January 24 Loan, the February 23 Loan, May 9 Loan and the May 10 Loan, in each case, when due between May 9, 2023 and May 11, 2023;

    (ii)    an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to return any and all of the remaining BTC under the June 22 Loan when due on May 11, 2023;

    (iii)    an Event of Default under Section VIII(b) of the DCGI MLA relating to the failure of DCGI to pay any and all Late Fees under the June 22 Loan within ten (10) days of the date when due;

WHEREAS, as of the date hereof, GGC has alleged, and DCG and DCGI dispute, that the following Events of Default (collectively, the "Specified Potential Events of Default" and, together with the Specified Admitted Events of Default, the "Specified Events of Default") under the DCG MLA or the DCGI MLA, as applicable, may have occurred and may be continuing:

    (i)    an Event of Default under Section VIII(b) of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to pay any and all Loan Fees or Late Fees within ten (10) days of the date when due; and

    (ii)    an Event of Default under Section VIII(b) of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to pay any and all Loan Fees within ten (10) days of the date when due.

WHEREAS, on December 15, 2022, DCG sent a letter to GGC asserting that DCG had effectuated a setoff, as of November 17, 2022, of the approximately $52.5 million DCG paid to Luno Australia Pty Ltd ("Luno") pursuant to the Limited Guaranty, dated November 11, 2022, between DCG and Luno, under which DCG guaranteed up to $60 million of GGC's obligations to Luno (under that certain Master Digital Assets Loan Agreement dated August 30, 2022).

WHEREAS, as described in the December 15, 2022 letter to GGC, DCG asserts that it exercised its subrogation rights to Luno and set off the $52.5 million paid by DCG to Luno against amounts DCG owes to GGC under the January 24 Loan (the "Luno Setoff").

WHEREAS, GGC disputes the validity of the Luno Setoff.

WHEREAS, on August 29, 2023, the Genesis Debtors, the Committee and DCG announced an agreement-in-principle as set forth on that certain *Notice of Mediation Termination*, ECF No. 625 (the "Agreement in Principle") filed in the Genesis Chapter 11 Cases.

WHEREAS, on May 9, 2023, DCG sent GGC a request for wire instructions by email at 10:37 p.m. (ET) (the "Wire Instructions Request") to convert the Loans issued under the DCG MLA to Open Loans.

WHEREAS, on May 9, 2023, GGC responded to the Wire Instructions Request, which response, under the terms of the DCG MLA, constituted a denial by GGC of DCG's request to convert such loans to Open Loans.

WHEREAS, on May 12, 2023, GGC sent the DCG Parties a Notice of Default and Reservation of Rights letter ("GGC Notice of Default Letter"), which noted, among other things, that the Loans issued under the DCG MLA and DCGI MLA were due and owing, and that Late Fees were accruing under the DCG MLA and DCGI MLA.

WHEREAS, on May 25, 2023, the DCG Parties responded to the GGC Notice of Default Letter noting, among other things, that the DCG Parties dispute GGC's assertion that Late Fees are accruing under the DCG MLA and that any Late Fees on Loan Fees are accruing under the DCG MLA and DCGI MLA.

WHEREAS, the disputes relating to the validity of the Luno Setoff and the accrual of Late Fees under the DCG MLA and DCGI MLA remain open disputes and, notwithstanding anything contained in this Agreement, the Parties reserve all of their rights and defenses with respect thereto.

WHEREAS, DCG acknowledges and agrees that the Specified Admitted Events of Default have occurred and are continuing and GGC has the right under Section XII of each of the DCG MLA and the DCGI MLA to seek reimbursement for all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights thereunder.

WHEREAS, the DCG Parties have requested, and GGC has agreed to, subject to the terms and conditions set forth herein, the Forbearance (as defined below) during the Forbearance Period (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises, and covenants set forth below, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Defined Terms.  For purposes of this Agreement, the following terms, in addition to the terms defined in the preamble and recitals above, shall have the following meanings:

(a)      "Asset Carve-Out Schedule" has the meaning set forth in Section 3 of this Agreement.

(b)      "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the chapter 11 cases of the Genesis

Debtors and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

(c)       "BTC" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

(d)       "BTC Portion" has the meaning set forth in Section 6(a) of this Agreement.

(e)       "Capital Stock" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest, and profits interests, participations, or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

(f)       "Committee" means the Official Committee of Unsecured Creditors appointed in the Genesis Chapter 11 Cases.

(g)       "Digital Asset" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins, and tokens, such as security tokens, utility tokens, and governance tokens.

(h)       "Event of Bankruptcy" shall mean, with respect to any person or entity, such person or entity (i) is dissolved, (ii) makes a general assignment, arrangement, scheme or composition with or for the benefit of its creditors generally, or such a general assignment, arrangement scheme or composition becomes effective, (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other similar relief under any bankruptcy or insolvency law or other law affective creditors' rights, or a petition is presented for its winding-up or liquidation, (iv) has a resolution passed for its winding-up or liquidation, (v) seeks or becomes subject to the appointment of an administration, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets, (vi) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced, sued on or against all or substantially all its assets, or (vii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in (i) to (vii) above.

(i)       "Forbearance" has the meaning set forth in Section 4 of this Agreement.

(j)       "Forbearance Fee" has the meaning set forth in Section 6(b) of this Agreement.

(k)      "Forbearance Period" shall mean the period commencing on (and including) the Partial Repayment Agreement Effective Date and ending on the Forbearance Termination Date.

(l)      "Forbearance Termination Date" means the earliest of (i) the Plan Effective Date, (ii) the date on which GGC or the DCG Parties, as applicable, delivers a Termination Notice in accordance with Section 7 hereof and (iii) the date on which an Automatic Forbearance Termination Event occurs.

(m)      "Forbearance Termination Event of Default" has the meaning set forth in Section 7 of this Agreement.

(n)      "Genesis Chapter 11 Cases" means, collectively, the cases commenced by the Genesis Debtors in the Bankruptcy Court jointly-administered under the case caption *In re Genesis Global Holdco, LLC, et al*., Case No. 23-10063.

(o)      "Genesis Debtors" means, collectively, GGC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd.

(p)      "Global Restructuring Agreement" means that certain Global Restructuring Agreement that may be executed by and among the Genesis Debtors, DCG and the Committee in accordance with the Agreement in Principle.

(q)      "Indebtedness" means, with respect to any person or entity (i) all indebtedness for borrowed money; (ii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iii) all Indebtedness secured by any Lien on any property or asset owned or held by such person or entity regardless of whether the Indebtedness secured thereby will have been assumed by such person or entity or is nonrecourse to the credit of that person or entity; (iv) the face amount of any letter of credit issued for the account of such person or entity or as to which such person or entity is otherwise liable for reimbursement of drawings; (v) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such person or entity of indebtedness of any other person or entity in respect of items in clauses (i)-(v) of this definition; (vi) any obligation of such person or entity the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (vii) obligations of such person or entity in respect of derivative transactions or instruments that are not principally for the purpose of hedging such person or entity's exposure; and (viii) obligations of such person in respect of any exchange traded or over the counter derivative transaction entered into for speculative purposes; provided that, notwithstanding the foregoing, Indebtedness shall exclude (i) capital leases, (ii) any obligation owed for all or any part of the deferred purchase price of property, equipment or services, (ii) accounts payable, payroll and other liabilities and accrued expenses incurred in the ordinary course of business that are not overdue by more than one hundred eighty (180) from the date of incurrence of the obligations in respect thereof, (iii) accruals for payroll and other liabilities

in the ordinary course of business, or (iv) other credit card, bank product or trade obligations incurred in the ordinary course of operating the DCG Parties' businesses.

(r)      "Loan Documents" has the meaning set forth in Section 10(c) of this Agreement.

(s)      "Material Adverse Change" means any circumstance, condition, or event that would reasonably be expected to materially and adversely affect (i) the business, assets, financial condition or results of operations, in each case, of DCG and its subsidiaries taken as a whole, or (ii) the ability of any DCG Party to perform its obligations under, or otherwise comply with any of the provisions of, this Agreement or the Loan Documents.

(t)      "Minimum Repayment Amount" has the meaning set forth in Section 6 of this Agreement.

(u)      "Net Proceeds" means the proceeds in excess of $10 million after payment of transaction expenses from any disposition of assets on the Asset Carve-Out Schedule.

(v)      "New Second Lien Facility" means the second-lien facility contemplated by the Agreement in Principle, as may be amended in the Global Restructuring Agreement, proposed to be entered into on the Plan Effective Date by DCG, as borrower, and GGC, as lender.

(w)      "Notice of Stay" has the meaning set forth in Section 6(a) of this Agreement.

(x)      "Partial Repayment Agreement Effective Date" has the meaning set forth in Section 5 of this Agreement.

(y)      "Payment Date" means the date on which each of the First Payment, Second Payment or Third Payment is due under this Agreement.

(z)      "Plan Effective Date" means the effective date of the chapter 11 plan for the Genesis Debtors in the Genesis Chapter 11 Cases.

(aa)      "Restricted Junior Payment" means (i) any dividend, other distribution, or liquidation preference, direct or indirect, on account of any shares of any class of Capital Stock of DCG now or hereafter outstanding; (ii) any redemption, retirement, sinking fund, or similar payment, purchase, or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iv) management or similar fees payable to any of the holders of Capital Stock issued by DCG; and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund, or similar payment with respect to, any indebtedness that is contractually subordinated in payment ranking to the obligations under the Loan Documents; provided, however, that nothing contained herein shall (a) affect the DCG Parties' ability to

effectuate any transactions set forth in (i) – (v) above if each such transaction is below $3 million or $8 million cumulatively, or (b) restrict DCG's issuance of shares of any class of Capital Stock to current and/or former employees pursuant to an ordinary course contractual or legal obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements; provided further that such transaction or issuance is otherwise compliant with Section 3 herein.

(bb)    "Termination Notice" has the meaning set forth in Section 7 of this Agreement.

(cc)    "Turnover Actions" collectively mean those certain complaints filed in the Genesis Chapter 11 Cases on September 6, 2023, captioned as *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. 23-01168 and *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Adv. Pro. 23-01169, with respect to certain amounts outstanding under the DCG MLA and the DCGI MLA, respectively.

(dd)    "USD Portion" has the meaning set forth in Section 6(a) of this Agreement.

2.    Agreements and Acknowledgements.

(a)    Each DCG Party acknowledges, represents and warrants that the recitals to this Agreement are true and correct in all material respects.

(b)    Each DCG Party acknowledges and agrees that, as of the Partial Repayment Agreement Effective Date (as defined below), without giving effect to any reductions as shall be set forth in the Global Restructuring Agreement, (i) the aggregate outstanding principal amount of Loans under the DCG MLA is $500,000,000.00, (ii) the aggregate outstanding principal amount of Loans under the DCGI MLA is 4,550.45173345 BTC and 14,048 BCH, and (iii) the total outstanding amount of Late Fees under the DCGI MLA as of August 31, 2023 is 70.43849944 BTC.   Each of DCG and DCGI acknowledges, represents and warrants to GGC that such obligations are validly owed or owing under the respective MLAs, and each of DCG and DCGI is obligated with respect to the DCG MLA or the DCGI MLA, as applicable.

(c)    DCG acknowledges that GGC has not waived, released, or compromised any occurrences, acts, or omissions that may constitute or give rise to any defaults or Events of Default (including the Specified Events of Default) that existed or may have existed, may presently exist, or may arise in the future, nor does GGC waive any rights or remedies under the Loan Documents (other than, to the extent expressly set forth herein, with respect to the Specified Events of Default during the Forbearance Period) or any other agreements or arrangements with DCG or DCG not governed by the MLAs or terms sheets in respect thereof.  The Specified Admitted Events of Default shall be deemed to have occurred and be continuing for all purposes under the MLAs and the other Loan Documents, notwithstanding any subsequent cure or any other event or condition after the date hereof that would cause any Specified Admitted Event of Default to be no longer continuing, and

such Specified Admitted Event of Default may only be cured or waived on terms and conditions satisfactory to GGC.

3.    <u>Negative Covenants</u>.  Without the prior written consent of GGC, each DCG Party agrees that it shall not, during the Forbearance Period (unless the Forbearance Period is terminated pursuant to Section 7(a)(ii) of this Agreement, in which case this Section 3 shall survive the termination of the Forbearance Period or this Agreement), (a) directly or indirectly dispose of any assets having a fair market value in excess of $10 million in any single transaction or series of transactions or in excess of $30 million in aggregate, <u>provided</u>, however, a DCG Party may transfer assets identified on a schedule as agreed upon by the Parties prior to entry of this Agreement (the "<u>Asset Carve-Out Schedule</u>") if it uses the Net Proceeds to repay amounts due to GGC under the Loan Documents, (b) create, incur, assume, or otherwise become or remain liable with respect to any Indebtedness in an amount exceeding $30 million, (c) declare, order, pay, make, or set apart, or agree to declare, order, pay, make, or set apart, any sum for any Restricted Junior Payment, except with respect to DCG's issuance of any class of Capital Stock to current and/or former employees pursuant to an ordinary course legal or contractual obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements, (d) enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer or consent to any such transaction, liquidation, winding up or dissolution), or dispose of, in any single transaction or series of related transactions, all or substantially all of its assets, or (e) enter into or permit to exist any transaction that is not on an arms' length basis (including the purchase, sale, lease or exchange of any property or the rendering of any service) with (i) any holder of ten percent (10%) or more of any class of Capital Stock of DCG or any of its subsidiaries or any affiliate of such holder, (ii) any affiliate of DCG (excluding the Genesis Debtors), or (iii) any joint venture in which any DCG Party or any of its respective affiliates holds any Capital Stock; provided that the DCG parties shall provide written notice to GGC of any affiliated transactions (other than those described in the following sentence) that are on an arms' length basis no later than two (2) business days after entering into such affiliated transaction; provided further that, if GGC does not file or cause to be filed the Notice of Stay on or prior to the date that is three (3) Business Days after the Partial Repayment Agreement Effective Date, the foregoing restrictions in this Section 3 (as applied to the DCG Parties) shall cease to be effective until such time as the Notice of Stay is filed.  Notwithstanding anything to the contrary herein, this Agreement shall not restrict or prohibit any of the DCG Parties from (A) funding any subsidiaries of the DCG Parties for payroll, overhead or operating costs and expenses of subsidiaries of GGC in the ordinary course, (B) entering into any token rebalancing transactions or selling any token positions, (C) receiving any payments, dividends, distributions or outflows from any of DCG's subsidiaries or companies within the DCG Parties' venture portfolio (D) selling any minority stakes in companies within the DCG Parties' venture portfolio for an aggregate value of no more than $8 million (provided that the foregoing $8 million cap shall not apply to the extent that proceeds from such sales are used to satisfy the DCG Parties' obligations under the Loan Documents), or (E) incurring any debt if the proceeds of such debt will be used to satisfy the DCG Parties' obligations under the Loan Documents; <u>provided</u> that DCG and DCGI shall provide written notice to GGC of any sale or incurrence of debt described in the foregoing clauses (D) and (E) no later than two (2) days following such sale or incurrence.

4.      Limited Forbearance.

(a)      Except as otherwise provided in this Agreement, and subject to the terms and conditions set forth in this Agreement, GGC agrees that during the Forbearance Period it will not pursue or prosecute the Turnover Actions, or (ii) file any action in any jurisdiction and/or initiate any legal proceeding to enforce any of its rights and remedies in respect of the Specified Events of Default (the "Forbearance"); provided that, notwithstanding the Forbearance or anything to the contrary in this Agreement, both GGC and the DCG Parties reserve their rights with respect to whether there are Late Fees accruing on the Loans issued under the DCG MLA; provided, further, that notwithstanding the Forbearance or anything to the contrary in this Agreement, GGC reserves the right to assert that it is entitled to (x) payment of any and all Loan Fees and Late Fees that may become due under the applicable provisions of MLAs (it being understood that DCG disputes that Late Fees are due under the DCG MLA) and (y) reimbursement of all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights under the MLAs, as applicable, in each case including during the Forbearance Period.

(b)      The Forbearance shall be limited precisely as written, relate solely to the Specified Events of Default in the manner and to the extent described in this Agreement, and shall not (i) be deemed a waiver of any default or Event of Default that is not a Specified Event of Default that may now be in existence or that may hereafter occur, nor imply that GGC would be obligated to or would waive any default or Event of Default (including the Specified Events of Default) following the expiration or termination of the Forbearance Period, or (ii) prejudice any right or remedy that GGC may now have or may have in the future under or in connection with the Loan Documents or any other instrument or agreement referred to therein, including, without limitation, any right or remedy in connection with the Specified Events of Default following the expiration or termination of the Forbearance Period.

(c)      Notwithstanding the Forbearance granted pursuant to this Section 4, for the purposes of any provision of the MLAs permitting any action by DCG or DCGI, as applicable, in the absence of a default or Event of Default (or any kind of default or Event of Default), or conditioning any right of DCG, DCGI, or GGC on the absence of a default or Event of Default (or any kind of default or Event of Default), the Specified Events of Default shall be deemed to be continuing upon its occurrence.

(d)      Starting on the first Business Day after the expiration or termination of the Forbearance Period, GGC may at any time thereafter proceed to enforce any or all of its rights and remedies under any Loan Document and applicable law (subject to the terms of the applicable Loan Document and applicable law) in connection with the Specified Events of Default; provided that GGC shall be permitted to exercise any enforcement rights with respect to this Agreement at any time during the Forbearance Period and shall be permitted to file a notice of the termination or expiration of the Forbearance Period immediately upon such termination or expiration; provided further that DCG and DCGI shall have the later of (i) thirty (30) days after such termination or expiration of the Forbearance Period and

(ii) any date as ordered by the Bankruptcy Court, to file an answer in the Turnover Actions, unless the Forbearance Period is terminated pursuant to Section 7(a)(ii), in which case DCG and DCGI shall have ten (10) Business Days after such termination to file an answer in the Turnover Actions.  In furtherance of the foregoing, and notwithstanding the Forbearance, each DCG Party acknowledges and confirms that, following the expiration or termination of the Forbearance Period, all rights and remedies of GGC under the Loan Documents and applicable law in connection with the Specified Events of Default and with respect to the DCG Parties shall continue to be available to GGC.  For the avoidance of doubt, each DCG Party acknowledges and confirms that the Forbearance shall not apply to or preclude any remedy available to GGC in connection with any proceeding commenced by or on behalf of a DCG Party under any bankruptcy or insolvency law, including, without limitation, to any relief in respect of adequate protection or relief from any stay imposed under such law.

(e)     The Parties agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that GGC may be entitled to take or bring in order to enforce its rights and remedies against any DCG Party under the MLAs are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(f)     Each DCG Party understands and agrees to the temporary nature of the Forbearance provided hereby and that GGC has given no assurances that it will, and shall have no obligation to, extend the duration of the Forbearance Period or enter into any other waiver, forbearance, amendment or agreement.  Any agreement by the DCG Parties and GGC to extend the Forbearance Period, if any, shall be set forth in writing and signed by a duly authorized signatory of each of the DCG Parties and GGC.

(g)     The Forbearance granted pursuant to this Section 4 is granted on the condition that no default or Event of Default, other than the Specified Events of Default, shall exist under the Loan Documents.

5.     Effectiveness of Agreement.  This Agreement shall become effective on the first date (such date, the "Partial Repayment Agreement Effective Date") on which this Agreement has been duly executed and delivered by each of the Parties.

6.     Payments of Loans and Fees.  In consideration for the Forbearance as set forth herein:

(a)     The DCG Parties shall pay GGC, in payment of the DCG Loans and the June 2022 Loan, a total of $275,000,000 (the "Minimum Repayment Amount") in accordance with the following payment schedule: (i) $75,000,000 on the earlier of (A) a date within one (1) Business Days after the filing of a notice of stay with respect to the Turnover Actions in the Genesis Chapter 11 Cases (the "Notice of Stay"), which shall occur no later than three (3) Business Days after the Partial Repayment Agreement Effective Date, and (B) the Plan Effective Date (the "First Payment"); (ii) $75,000,000 on the earlier of (A) the date that is 47 days after the Partial Repayment Agreement Effective Date and (B) the Plan Effective Date (the "Second Payment"); (iii) $75,000,000 on the earlier of (A) the

date that is 45 days after the Second Payment and (B) the Plan Effective Date (the "Third Payment"); and (iv) $50,000,000 on the earlier of (A) the date that is 45 days after the Third Payment and (B) the Plan Effective Date; provided that the payments set forth in clauses (i)-(iv) shall cumulatively be made 78% in USD (the "USD Portion") and 22% in BTC (the "BTC Portion") and (2) the obligation of the DCG Parties to make the payments set forth in clauses (i)-(iv) shall be contingent on the timely filing of the Notice of Stay as described in clause (i)(A) above.  Any such USD payments made under this Section 6(a) will first reduce the principal balance of the January 24 Loan until such balance is fully repaid, and next will reduce the principal balance of the May 9 Loan until such balance is fully repaid; any such BTC payments made under this Section 6(a) will reduce the principal balance of the June 22 Loan.  DCG shall solely be responsible for the USD Portion and DCGI shall solely be responsible for BTC Portion.  Nothing herein shall impute joint or several liability to DCG with respect to the BTC Portion, or to DCGI with respect to the USD Portion of the payments, respectively.

(b)     The DCG Parties shall pay a total fee in USD (the "Forbearance Fee") in an amount equal to 0.375% of the aggregate principal amount outstanding of the Loans under the MLAs on the Partial Repayment Agreement Effective Date, each in their respective capacities as Borrowers under the MLAs, as applicable, within two (2) Business Days of the Partial Repayment Agreement Effective Date, and GGC agrees that the Forbearance Fee shall be credited against the USD Portion of the final $50,000,000 payment.  Each of DCG and DCGI shall be jointly and severable liable for the Forbearance Fee.

(c)     Notwithstanding anything to the contrary in the DCGI MLA, DCGI agrees to pay all Late Fees that are or become payable under the DCGI MLA and relevant term sheets in accordance with the terms of such agreements during the Forbearance Period; provided however, all rights and defenses of the Parties are fully preserved with respect to any Late Fees owing under the DCG MLA and relevant term sheets.

(d)     To the extent the DCG Parties make payments pursuant to this Agreement that are in the aggregate greater than the Minimum Repayment Amount (without consideration to any amounts paid under this Agreement in respect of Loan Fees or Late Fees under either the MLAs), DCG shall be entitled to a greater than dollar-for-dollar reduction in the original principal amount of the New Second Lien Facility (as described in the Agreement in Principle, as may be amended in the Global Restructuring Agreement), with an additional $65,000,000 in total aggregate amount of payments exceeding the Minimum Repayment Amount reducing the original principal amount of the New Second Lien Facility by $95,000,000 and each additional $10,000,000 in total aggregate amount of payments thereafter reducing the original principal amount of the New Second Lien Facility by a further $15,000,000; provided, however, that if the Parties do not execute the Global Restructuring Agreement, then any payments made under this Section 6(c) shall reduce the principal balance of the amounts owed under the DCG Loans or June 22 Loan, as applicable, by the amount actually paid, without any greater than dollar-for-dollar reduction.

7.      <u>Default</u>.

(a)      Except in respect of the Specified Events of Default, upon the occurrence of any one or more of the following events (each a "<u>Forbearance Termination Event of Default</u>"), GGC shall provide notice to the DCG Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intent to terminate the Forbearance Period, which termination shall become effective upon the delivery of the Termination Notice to the DCG Parties:

(i)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in this Agreement and (other than in the case of Section 6 (*Payments of Loans and Fees*)) such failure or breach is not cured (if curable) within fifteen (15) calendar days of (x) delivery of a written notice by GGC or (y) any DCG Party having actual knowledge of such breach or failure;

(ii)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition in Section 6 (*Payments of Loans and Fees*)) if such failure or breach is not cured within one (1) Business Day;

(iii)      the occurrence of a Material Adverse Change;

(iv)      any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in any of the Loan Documents (including the failure to pay Loan Fees as required under the MLAs), other than a Specified Event of Default, and does not cure such failure within any applicable cure period provided in the applicable Loan Document;

(v)      the occurrence of an Event of Default under the DCG MLA or DCGI MLA, other than a Specified Event of Default;

(vi)      any Party fails to observe or perform, or is in breach of, any covenant, term, or condition contained in the Global Restructuring Agreement, and does not cure such failure within any applicable cure period provided in the Global Restructuring Agreement;

(vii)      the termination of the Global Restructuring Agreement in accordance with its terms; or

(viii)      GGC determines, in its sole discretion following consultation with its legal and financial advisors, that termination of this Agreement is appropriate, necessary or consistent with the exercise of its fiduciary duties; <u>provided</u> that, notwithstanding anything to the contrary in this Section 7(a), GGC shall provide the DCG Parties with at least ten (10) calendar days' prior written notice before such termination shall become effective; <u>provided</u> <u>further</u> that in the event a DCG Party makes a payment or uses proceeds from the sale of assets as described in Section 3(a) and Section 3(c) to pay obligations owed under the Loan Documents in advance of the next Payment Date, such payments shall be credited toward the

amounts due on future Payment Dates and GGC shall not exercise the termination right described in this Section 7(a)(viii) prior to the next Payment Date.

(b)     Upon the issuance by any governmental authority, including any regulatory authority or the Bankruptcy Court or a court of competent jurisdiction, of any ruling, judgment, or order enjoining GGC's or any of the DCG Parties' entry into and performance under this Agreement, the Parties may elect to provide notice to the other Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intention to terminate this Agreement, which termination shall become effective upon the delivery of a Termination Notice.

(c)     On or after the date that is forty-seven (47) days after the Partial Repayment Agreement Effective Date, any Party may give written notice to the other Parties of its intention to terminate this Agreement on the date, which termination shall be effective upon the delivery of such notice to the other Parties, in the event that at such time either (i) the Global Restructuring Agreement has not been executed; or (ii) the Genesis Debtors have not filed an amended chapter 11 plan and disclosure statement, consistent with the Agreement in Principle and as otherwise reasonably acceptable to DCG (as may be amended by the Global Restructuring Agreement or as otherwise agreed by the Parties).

(d)     Notwithstanding the foregoing or anything to the contrary in the MLAs, the Forbearance Period shall automatically be terminated without any action necessary by any Party upon the occurrence of an Event of Bankruptcy with respect to DCG or DCGI (an "Automatic Forbearance Termination Event").

(e)     Any notice provided by any Party indicating an intention to terminate either the Forbearance Period or this Agreement pursuant to (and in accordance with the terms of) this Section 7 shall be referred to as a "Termination Notice".

8.     Representations and Warranties of DCG.  To induce GGC to enter into this Agreement, each DCG Party represents and warrants to GGC that, as of the Partial Repayment Agreement Effective Date:

(a)     the execution, delivery, and performance of this Agreement (i) are within such DCG Party's corporate or other organizational powers (as applicable), (ii) have been duly authorized by all necessary corporate or other organizational action (as applicable) on the part of such DCG Party, and (iii) do not and will not breach, violate, conflict with, or constitute a default under (A) any provision of any law or any governmental rule or regulation applicable to such DCG Party, (B) any of the organizational documents of such DCG Party, (C) any order, judgment, or decree of any court or other agency of government binding on such DCG Party, or (D) any agreement to which such DCG Party is a party;

(b)     each of DCG and DCGI has duly executed and delivered this Agreement, and each of this Agreement, the DCG MLA or the DCGI MLA, as applicable, and the applicable Loan Term Sheets constitutes the legal, valid, and binding obligation of such DCG Party enforceable in accordance with its terms; and

13

(c)       (i) other than the Specified Events of Default, no actual or potential default or Event of Default has occurred and is continuing and (ii) except with respect to the Specified Events of Default, all representations and warranties made by either DCG Party contained herein, in the MLAs, as applicable, or in the other Loan Documents are true and correct in all material respects (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects) with the same effect as though such representations and warranties are made on and as of the Partial Repayment Agreement Effective Date, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects).

9.       Representations and Warranties of GGC.   To induce DCG to enter into this Agreement, GGC represents and warrants to the DCG Parties that, as of the Partial Repayment Agreement Effective Date:

(a)       GGC has full legal and corporate authority to enter into and perform under this Agreement without any order of the Bankruptcy Court or any court of competent jurisdiction; and

(b)       Other than the Specified Events of Default, GGC is not aware of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs, as applicable.

10.      Reference to and Effect on Loan Documents.

(a)       Ratification.   Each of DCG and DCGI hereby expressly acknowledges and agrees that all of the terms and conditions of, and their continued obligations and liability (including all of its payment and performance obligations, covenant obligations and obligation to indemnify, contingent or otherwise) under, the MLAs, and the other Loan Documents, as applicable, are hereby ratified and confirmed and continue unchanged and in full force and effect, except as otherwise set forth herein.

(b)       No Waiver.   Except as expressly set forth herein, neither the execution, delivery and effectiveness of this Agreement shall, directly or indirectly, (i) create any obligation to continue to defer any enforcement action with respect to the Specified Events of Default after the occurrence of any Forbearance Termination Event of Default (or with respect to an Event of Default not constituting a Specified Event of Default after the date hereof) or termination of this Agreement; (ii) constitute a consent or waiver of any past, present or future violations, including the Specified Events of Default or any other defaults and Events of Default, of any provisions of the MLAs, or any other Loan Documents; (iii) amend, modify, prejudice or operate as a waiver of any right, power, defense or remedy of GGC or any of its successors under the MLAs, or any of the other Loan Documents; (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction, or (v) constitute a course of dealing or other basis for altering any Loans or any other contract or instrument.   No course of dealing or any passage of time on

14

account of the Forbearance Period shall be considered or used as a basis for asserting an untimely exercise of any such Party's rights, for altering any obligation of any of DCG, DCGI or any other Person or any right, privilege defense or remedy of GGC under the MLAs, or any other Loan Document, or to otherwise prejudice any such right, power, defense or remedy. The DCG Parties expressly acknowledge and agree that there has not been, and this Agreement does not constitute or establish, a novation with respect to the MLAs, or any of the other Loan Documents. Except as otherwise expressly provided in this Agreement, GGC hereby reserves all of its rights and remedies under the Loan Documents and any other documents, instruments or agreements executed and delivered in connection therewith and any and all applicable law.

(c)     Loan Document. On and after the Partial Repayment Agreement Effective Date, this Agreement shall constitute a "Loan Document" as defined under the DCG MLA and shall constitute a "Loan Document" as defined under the DCGI MLA and the term "Loan Documents" shall collectively refer to this Agreement, the DCG MLA, the DCGI MLA, and any and all term sheets entered in connection with such MLAs.

11.     Miscellaneous.

(a)     Successors and Assigns. This Agreement shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and assigns to the same extent set forth in the Loan Documents.

(b)     Entire Agreement. This Agreement and the Loan Documents, as amended hereby, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof.

(c)     Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(d)     Severability. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)     Counterparts. This Agreement may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature

15

or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f)    Expenses.  Without limiting any terms or provisions of the Loan Documents, the DCG Parties agree, jointly and severally, to pay promptly all reasonable and documented costs and expenses incurred by GGC in connection with the enforcement or protection of GGC's rights under this Agreement, including, without limitation, the reasonable fees, charges, and disbursements of GGC's legal counsel.

(g)    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.   EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(h)    Appointment of Process Agent.  DCG hereby agrees that service of process in any such action or proceeding brought in connection with the DCG MLA, DCGI MLA, the Loan Agreements, the Turnover Actions or this Agreement, may be made upon it by serving a copy of any relevant pleadings on an agent designated by the DCG Parties (the "Designated Agent"), which shall be irrevocably appointed by the DCG Parties as its agent for service of process in respect of any such action or proceeding.  Within two (2) business days of the Partial Repayment Agreement Effective Date, the DCG Parties shall provide GGC with the identity and address of Designated Agent.  The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by each of the DCG Parties as such, and shall be legal and binding on each of the DCG Parties for all the purposes of any such action or proceeding.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

16

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _Mark Murphy_____

      Name:  Mark Murphy

      Title:   President

**DCG INTERNATIONAL INVESTMENTS LTD.**

By: _Michael Katz_____

      Name:  Mike Katz

      Title:   Legal Officer

17

Accepted and agreed as of the date first set forth above.

**HOLDER**:

**GENESIS GLOBAL CAPITAL, LLC**

By: _Derar Islim_

Name:

Title: Interim CEO

## **EXHIBIT C**
**Amendment to the Partial
Repayment Agreement**

## AMENDMENT TO PARTIAL REPAYMENT AGREEMENT

This Amendment (the "Amendment") is entered into as of November 28, 2023 in reference to that certain Partial Repayment Agreement (the "Original Partial Repayment Agreement" and the Original Partial Repayment Agreement as amended by the Amendment, the "Partial Repayment Agreement"), dated as of September 12, 2023, between Genesis Global Capital, LLC ("GGC") Digital Currency Group, Inc. ("DCG"), and DCG International Investments Ltd. ("DCGI," together with DCG, the "DCG Parties," and collectively with GGC, the "Parties").  All capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the Partial Repayment Agreement.

WHEREAS, on September 13, 2023, GGC received, pursuant to the terms of the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party:  (i) a Forbearance Fee in the amount of $2,315,937.92, (ii) a payment of $58,500,000 on account of outstanding principal in respect of the DCG Loans, (iii) a transfer of 638.54616543 BTC on account of outstanding principal in respect of the June 22 Loan and (iv) a transfer of 70.43849944 BTC on account of Late Fees accrued under the June 22 Loan as of August 31, 2023.

WHEREAS, on October 3, 2023, GGC received, prior to the applicable Payment Date under the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) two payments totaling $58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 599.91212208 BTC on account of outstanding principal in respect of the June 22 Loan.

WHEREAS, on October 20, 2023, GGC received, prior to the applicable Payment Date under the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) one payment in the amount of $58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 574.2224245 BTC on account of outstanding principal in respect of the June 22 Loan.

WHEREAS, as a result of the aforementioned payments by DCG under the Original Partial Repayment Agreement, DCG has paid, among other DCG Loans, the full principal balance of the January 24 Loan.

WHEREAS, the Global Restructuring Agreement was not executed by October 29, 2023 and the Genesis Debtors had not filed an amended chapter 11 plan and disclosure statement consistent with the Agreement in Principle by that date, and it is the Debtors' position that each of the Parties was, as of October 29, 2023, entitled to terminate the Original Partial Repayment Agreement pursuant to Section 7(c) thereof.

WHEREAS, the Parties seek to amend the Original Partial Repayment Agreement to provide for:

(i)     payment of the DCG Loans and the DCGI Loans in accordance with the payment schedule described herein;

(ii)    the pledge by DCG and DCGI of certain ETHE and ETCG (each as defined below) to GGC, pursuant to the Security Agreements, to secure the obligations of the DCG Parties with respect to the Outstanding Undisputed Amounts ; and

(iii)   entry of the joint stipulated orders and judgments (respectively, the "<u>DCG Joint Stipulated Order and Judgment</u>" and the "<u>DCGI Joint Stipulated Order and Judgment</u>" and together the "<u>Joint Stipulated Orders and Judgments</u>"), attached hereto as **Annex A** and **Annex B**, of which GGC will forbear from seeking execution except in the event of (a) failure by the applicable DCG Party to pay any portion of the Repayment Amount (as defined herein) on or prior to the dates set forth herein (any such failure by either of DCG or DCGI, a "<u>Nonpayment Event</u>"), (b) failure by DCG to make the transfer described in clause (ii) above in accordance with the terms of this Amendment, or (c) failure by the DCG Parties to comply with the Section 3 (Negative Covenants) of the Partial Repayment Agreement, each as set forth in amended Section 7 of the Partial Repayment Agreement; and

(iv)   extended Forbearance as set forth herein.

WHEREAS, after the DCG Parties have transmitted, and GGC has received, the Amendment Effectiveness Payment (as defined below), GGC intends to file a motion with the Bankruptcy Court seeking (i) entry of the Joint Stipulated Orders and Judgments and (ii) authority to take actions in furtherance of the Partial Repayment Agreement.

NOW THEREFORE, in consideration of the covenants and conditions set forth in the Original Partial Repayment Agreement and herein, it is agreed as follows:

1.   <u>Defined Terms</u>.

   a.   Section 1 of the Original Partial Repayment Agreement is hereby amended to add the following definitions in alphabetical order.

      i.   "<u>Amendment</u>" shall mean that certain Amendment to Partial Repayment Agreement, dated as of November 28, 2023, by and between GGC, DCG and DCGI.

      ii.   "<u>Amendment Effective Date</u>" has the meaning set forth in <u>Section 6</u> of the Amendment.

      iii.   "<u>BCH</u>" shall mean the cryptocurrency Bitcoin Cash.

      iv.   "<u>Committee</u>" shall mean the Official Committee of Unsecured Creditors in the chapter 11 cases of Genesis Global Holdco, LLC, *et al.*, Case No. 23-10063 (SHL).

      v.   "<u>DCG Security Agreement</u>" shall mean that certain Security Agreement, dated as of November 28, 2023, by and between GGC and DCG.

      vi.   "<u>DCGI Security Agreement</u>" shall mean that certain Security Agreement, dated as of November 28, 2023, by and between GGC and DCGI.

      vii.   "<u>ETHE</u>" shall mean shares of Grayscale Ethereum Trust.

viii.   "ETCG" shall mean shares of Grayscale Ethereum Classic Trust.

ix.   "Security Agreements" shall mean the DCG Security Agreement and the DCGI Security Agreement.

b.   The definition of Forbearance Period is hereby deleted and replaced with the following:

"Forbearance Period" shall mean the period commencing on (and including) the Partial Repayment Agreement Effective Date until the earlier of (i) occurrence of a Default and failure of the applicable DCG Party to cure such Default, to the extent such default can be cured by the terms of this Agreement, within the applicable time period, and (ii) April 1, 2024.

c.   The definition of Forbearance Termination Date is hereby deleted in its entirety.

d.   The definition of Forbearance Termination Event of Default is hereby deleted and replaced with the definition set forth herein.

e.   The definition of Material Adverse Change is hereby deleted and replaced with the following:

"Material Adverse Change" means any circumstance, condition, or event that is not known by GGC as of the Amendment Effective Date that would reasonably be expected to materially and adversely affect (i) the business, assets, financial condition or results of operations, in each case, of DCG and its subsidiaries taken as a whole, or (ii) the ability of any DCG Party to perform its obligations under, or otherwise comply with any of the provisions of, this Agreement or the Loan Documents.

2.   Agreements and Acknowledgements. Section 2(b) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

Each DCG Party acknowledges and agrees that, as of the Amendment Effective Date, (i) the aggregate outstanding principal amount of Loans under the DCG MLA is $324,500,000, (ii) the aggregate outstanding principal amount of Loans under the DCGI MLA is 2,737.77102141 BTC and 14,048 BCH, and (iii) the total outstanding amount of Late Fees under the DCGI MLA as of Monday, November 28, 2023 is 10.12600241 BTC (the amounts in (i)-(iii) each an "Outstanding Undisputed Amount" and collectively the "Outstanding Undisputed Amounts"). Each of DCG and DCGI acknowledges, represents and warrants to GGC that such obligations are validly owed or owing under the respective MLAs, and each of

DCG and DCGI is obligated with respect to the DCG MLA or the DCGI MLA, as applicable.

3.  Payment of Loans and Fees.

a.  Section 6(a) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

(a)  The DCG Parties shall comply with their obligations in Section 6(d) and make payments or transfers to GGC equal to the following amounts as payments of the DCG Loans and the DCGI Loans (the "Repayment Amount"), in accordance with the following payment schedule:

(i) within two (2) Business Days after the Amendment Effective Date, $35,000,000 (the "Amendment Effectiveness Payment");

(ii) commencing on December 7, 2023 and on the fifth (5th) Business Day of each calendar month thereafter, 50% of total digital assets and cash paid to DCG as a dividend from Grayscale Investments, LLC in the preceding calendar month in excess of $10,000,000, which dividend shall be paid and calculated in accordance with prior practice (the "Monthly Payment");

(iii) notwithstanding anything to the contrary in Section 3 of the Partial Repayment Agreement, within two (2) Business Days of the Amendment Effective Date, an amount of DCG's proceeds from the sale of CoinDesk, Inc. equal to the lesser of (x) $65,000,000 and (y) the total proceeds from the sale of CoinDesk, Inc., net of transaction costs for external advisors (the "CoinDesk Sale Payment");

(iv) the later of thirty (30) days after the Plan Effective Date and April 1, 2024, all Outstanding Undisputed Amounts owed under the DCG Loans and the DCGI Loans to the extent not previously paid pursuant to clauses (i)-(iii), other than in respect of (a) Late Fees owed under the DCG Loans and (b) enforcement costs pursuant to section XII of the DCG MLA and Section XII of the DCGI MLA ((a) and (b) together, the "Disputed Amounts"), which Disputed Amounts are subject to a mutual reservation of rights as to whether or not they are due or payable (such payment, the "Final Payment"), provided, however, that notwithstanding the foregoing, the Final Payment shall be made no later than April 1, 2024;

provided, that the payments set forth in clauses (i)-(iv) above shall be made 77% in USD (the "USD Portion") and 23% in BTC (the "BTC Portion"). Any payments of the USD Portion made under this Section 6(a) will first reduce the principal balance of the February 23 Loan until such balance is

fully repaid, and next will reduce the principal balance of the May 9 Loan until such balance is fully repaid, and next will reduce the principal balance of the May 10 Loan. Any payments of the BTC Portion made under this Section 6(a) will reduce the principal balance of the June 22 Loan. DCG shall solely be responsible for the USD Portion and DCGI shall solely be responsible for the BTC Portion. Notwithstanding anything to the contrary, nothing shall impute joint or several liability to DCG with respect to the BTC Portion, or to DCGI with respect to the USD Portion. BTC prices shall be based on the respective BTC market prices at 8:00 p.m. prevailing Eastern Time on the day before the applicable payment.

b.   Section 6(b) of the Original Partial Repayment Agreement is hereby amended to delete the phrase "and GGC agrees that the Forbearance Fee shall be credited against the USD Portion of the final $50,000,000 payment".

c.   Section 6(d) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

(d)    No later than fourteen (14) calendar days (or such later date as may be agreed by GGC) after the Amendment Effective Date, DCG and DCGI shall satisfy their obligations under clauses (iii) or (iv) of Section 2(a) of the Security Agreements and GGC shall act reasonably, promptly and in good faith to assist with any negotiation and execution of documentation in connection therewith, and which obligations GGC shall be deemed to satisfy if it executes: (i) a control agreement substantially in the form attached hereto as Exhibit A; and (ii) a representation letter substantially in the form attached hereto as Exhibit B; provided, that if either DCG or DCGI are unable to satisfy their obligations under clauses (iii) or (iv) of Section 2(a) of the applicable Security Agreement, DCG and/or DCGI, as applicable, shall have an additional three (3) Business Days (or such additional time as GGC may agree) to satisfy their obligations under clauses (i) and (ii) of Section 2(a) of the Security Agreements.

4.   <u>Transfer of Collateral</u>. Notwithstanding anything herein or in the Security Agreements to the contrary, pursuant to Section 13 of this Amendment, the DCG Parties shall have the right to transfer, in their sole discretion and upon written notice (each, a "<u>Voluntary Transfer Notice</u>"), all or part of the Collateral (as defined in the Security Agreements) to GGC, at which time, such transferred Collateral shall be valued using the market prices as of 8:00 p.m. Eastern Time on the date of such written notice and GGC shall

apply the value of such transferred Collateral to the Outstanding Undisputed Amounts as specified in the Voluntary Transfer Notice (each, a "<u>Voluntary Payment</u>").

5.   <u>Limited Forbearance</u>.

    a.  Section 4(a) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

        (a)  Except as otherwise provided in this Agreement, and subject to the terms and conditions set forth in this Agreement, GGC agrees that during the Forbearance Period it will not (i) further pursue or prosecute the Turnover Actions, (ii) file any action in any jurisdiction and/or initiate any legal proceeding to enforce any of its rights and remedies in respect of the Specified Events of Default, or (iii) seek execution of either of the Joint Stipulated Orders and Judgments (the "<u>Forbearance</u>"); provided that, notwithstanding the Forbearance or anything to the contrary in this Agreement, both GGC and the DCG Parties reserve their rights with respect to whether there are Late Fees accruing on the Loans issued under the DCG MLA; provided, further, that notwithstanding the Forbearance or anything to the contrary in this Agreement, GGC reserves the right to assert that it is entitled to (x) payment of any and all Loan Fees and Late Fees that may become due under the applicable provisions of MLAs (it being understood that DCG disputes that Late Fees are due under the DCG MLA) and (y) reimbursement of all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights under the MLAs, as applicable, in each case including during the Forbearance Period.

    b.  The following is hereby inserted as a new Section 4(h) of the Partial Repayment Agreement:

        (h)  The Forbearance Period (as set forth in this Section 4) is hereby extended until the earlier of (i) occurrence of a Default and failure of the applicable DCG Party to cure such Default, to the extent such Default can be cured by the terms of this Agreement, within the applicable time period, and (ii) April 1, 2024.

6.   <u>Effectiveness of Amendment</u>.  This Amendment shall be effective immediately upon the satisfaction of each of the following conditions: (i) this Amendment has been duly executed and delivered by each of the Parties; (ii) GGC and DGC have executed the DCG Joint Stipulated Order and Judgment, which shall be filed with the Bankruptcy Court after GGC has received the Amendment Effectiveness Payment; (iii) GGC and DGCI have executed the DCGI Joint Stipulated Order and Judgment, which shall be filed with the Bankruptcy Court after GGC has received the Amendment Effectiveness Payment; and (iv) the DCG Parties and GGC shall have entered into the Security Agreements (such date that each of the foregoing conditions has been satisfied, the

"Amendment Effective Date").

7.    Existing Defaults.  Section 9(b) of the Original Partial Repayment Agreement is hereby deleted in its entirety and replaced with the following:

> (b)    Other than the Specified Events of Default, GGC is not aware of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs or the Partial Repayment Agreement.  During the Forbearance Period, GGC shall forbear from exercising any rights and remedies in respect of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs or the Partial Repayment Agreement.

8.    Default.  Section 7 of the Original Partial Repayment Agreement is hereby deleted in its entirety and replaced with the following:

a.    Upon the occurrence of any one or more of the following events and a failure to cure within the applicable time period (each a "Default" or a "Forbearance Termination Event of Default"), GGC shall provide notice to the DCG Parties, in accordance with Section 11(i) of the Partial Repayment Agreement, of its intent to terminate the Forbearance Period, which termination shall become effective upon the delivery of a written notice of termination (the "Termination Notice") to the DCG Parties:

   i.    Any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant in Section 3 (Negative Covenants) and such failure or breach is not cured (if curable) within fifteen (15) calendar days of (x) delivery of a written notice by GGC or (y) any DCG Party having actual knowledge of such breach or failure.

   ii.    Any DCG Party fails to make the payments or transfers set forth in the Partial Repayment Agreement if such failure or breach is not cured within three (3) Business Days.

   iii.    Any DCG Party fails to comply with its obligations under the applicable Security Agreement or Section 6(d) of the Partial Repayment Agreement.

   iv.    The occurrence of a Material Adverse Change (the "MAC Default"); provided, that GGC shall provide ten (10) days' written notice of a MAC Default to the DCG Parties (the "Notice Period") and shall not take any enforcement action with respect to the Collateral or seek to terminate the

Partial Repayment Agreement or the Forbearance Period prior to the expiration of the Notice Period.

v. The occurrence of any Event of Bankruptcy with respect to DCG or DCGI.

vi. Conversion of the Debtors' chapter 11 cases to cases under chapter 7 of section 11 of the United States Code.

vii. Notification in writing by DCG or DCGI to GGC of DCG's or DCGI's inability to, or intention not to, perform its obligations hereunder, or disaffirmation, rejection, or repudiation by DCG or DCGI of its obligations hereunder.

b. Notwithstanding the foregoing or anything to the contrary in the MLAs, the Forbearance Period shall automatically be terminated without any action necessary by any Party upon the occurrence of an Event of Bankruptcy with respect to DCG or DCGI, or conversion of the Debtors' chapter 11 cases to cases under chapter 7 of section 11 of the United States Code (either such event, an "Automatic Forbearance Termination Event").

9.   Terms of Original Partial Repayment Agreement Unchanged Except as Amended. Except as otherwise provided herein, the Original Partial Repayment Agreement shall remain unchanged and in full force and effect. On and after the date hereof, each reference in the Original Partial Repayment agreement or the Partial Repayment Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Partial Repayment Agreement, as amended hereby, although it shall not alter the dates as of which any provision of the Partial Repayment Agreement speaks.

10.   Provision of Grayscale Digital Asset and Cash Dividend Statement by DCG Parties. Section 3 of the Original Partial Repayment Agreement is hereby amended to add the following as a new sentence at the end of Section 3:

Prior to the fifth (5th) Business Day of each month subsequent to the Amendment Effective Date, the DCG Parties shall provide to the advisors to GGC and the advisors to the Committee, on a confidential and professionals'-eyes-only basis, a verified statement, signed by an officer of DCG, including a calculation of the amount of digital assets and cash paid to DCG as a dividend from Grayscale Investments, LLC in the previous calendar month.

11.   Rights Regarding Luno Setoff Claim.  Nothing in this Amendment or in the Partial Repayment Agreement shall operate as a waiver of (i) DCG's rights, if any, to seek a reimbursement from GGC or any other person or entity or a declaratory judgment or enforcement of its setoff rights against GGC or any other person or entity on account of the Luno Setoff Dispute (as defined herein) or a claim for payment against GGC or any other person or entity of the amounts paid by DCG to Luno Australia Pty Ltd. on behalf of GGC on November 16, 2022, as identified in that certain *Notice of Setoff*,

8

dated December 15, 2022, in connection with that certain Limited Guaranty between DCG and Luno and any interest accrued on the setoff amount that has been paid by DCG to GGC (the "Luno Setoff Dispute"), or (ii) GGC's rights or defenses, if any, with respect to the Luno Setoff Dispute.

12.   Entry of Joint Stipulated Orders and Judgments.  After execution of this Amendment, GGC shall file and seek entry of the Stipulated Orders and Judgments by the Bankruptcy Court in the amount of the Outstanding Undisputed Amounts owed by DCG and DCGI, respectively, plus any additional Loan Fees and Late Fees (other than any Disputed Amounts) accrued under the applicable MLA, less any payments made by DCG or DCGI under the MLAs, including any payments made pursuant to Section 6(a) of the Partial Repayment Agreement, subsequent to the Amendment Effective Date (such total amounts, as against DCG, the "DCG Judgment Amount" and as against DCGI, the "DCGI Judgment Amount").

13.   Payment of Repayment Amount Prior to Timeline Agreed Herein.  Notwithstanding anything contained herein, in the Partial Repayment Agreement or in DCG MLA or DCGI MLA, the DCG Parties may pay at any time, prior to the timeline articulated in Section 6(a) of the Partial Repayment Agreement, their respective obligations under the DCG MLA and DCGI MLA, as applicable, in whole or in part at any time, from time to time and without penalty or premium.  The Partial Repayment Agreement shall terminate as to DCG upon full payment of the Outstanding Undisputed Amounts under the DCG MLA.  The Partial Repayment Agreement shall terminate as to DCGI upon full payment of the Outstanding Undisputed Amounts under the DCGI MLA.

14.   Reference to and Effect on Loan Documents.

   a.   Ratification.  As of the date hereof, each of DCG and DCGI hereby expressly acknowledges and agrees that all of the terms and conditions of, and their continued obligations and liability (including all of its payment and performance obligations, covenant obligations and obligation to indemnify, contingent or otherwise) under the MLAs and the other Loan Documents, as applicable, including the Partial Repayment Agreement are hereby ratified and confirmed and continue unchanged and in full force and effect, except as otherwise set forth herein.

15.   Notice.  The Original Partial Repayment Agreement is hereby amended to add the following as Section 11(i):

   (i)   Any notices to be provided pursuant to the Partial Repayment Agreement may be provided to the following email addresses and will be deemed effective upon receipt.

         If to the DCG Parties: jeffrey.saferstein@weil.com; jessica.liou@weil.com

         If to GGC:  soneal@cgsh.com; jvanlare@cgsh.com

16. <u>Miscellaneous</u>.

    a.  <u>Successors and Assigns</u>.  This Amendment shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and permitted assigns to the same extent set forth in the Loan Documents.

    b.  <u>Entire Agreement</u>.  This Amendment and the Loan Documents, as amended hereby, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof.  In the event of a conflict between this Amendment and the Partial Repayment Agreement, the provisions of this Amendment will control.

    c.  <u>Headings</u>.   Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

    d.  <u>Severability</u>.  Wherever possible, each provision of this Amendment shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Amendment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment.

    e.  <u>Survival</u>.  Notwithstanding anything contained herein or in the Partial Repayment Agreement, if the Partial Repayment Agreement is terminated in accordance with Section 7 of the Partial Repayment Agreement, no provision of the Partial Repayment Agreement shall survive.

    f.  <u>Counterparts</u>.  This Amendment may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement.   Delivery of an executed counterpart of a signature page to this Amendment by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Amendment. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based record keeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

    g.  <u>Expenses</u>.  Without limiting any terms or provisions of the Loan Documents, the DCG Parties agree, jointly and severally, to pay promptly all reasonable and documented costs and expenses incurred by GGC in connection with the

enforcement or protection of GGC's rights under this Amendment, including, without limitation, the reasonable fees, charges, and disbursements of GGC's legal counsel.

h. <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Amendment and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Amendment, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Amendment or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court. By execution and delivery of this Amendment, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT.

i. <u>Appointment of Process Agent</u>. DCG hereby agrees that service of process in any such action or proceeding brought in connection with the DCG MLA, DCGI MLA, the Loan Agreements, the Turnover Actions, the Partial Repayment Agreement, or this Amendment, may be made upon it by serving a copy of any relevant pleadings on an agent designated by the DCG Parties (the "<u>Designated Agent</u>"), which shall be irrevocably appointed by the DCG Parties as its agent for service of process in respect of any such action or proceeding. Within two (2) Business Days of the Amendment Effective Date, the DCG Parties shall provide GGC with the identity and address of Designated Agent. The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by each of the DCG Parties as such, and shall be legal and binding on each of the DCG Parties for all the purposes of any such action or proceeding.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _Simon Koster_____
      Name:  Simon Koster
      Title:   Chief Strategy Officer

**DCG INTERNATIONAL INVESTMENTS LTD.**

By: _Michael Katz_____
      Name:  Michael Katz
      Title:   Legal Officer

Accepted and agreed as of the date first set forth above.

**HOLDER**:

**GENESIS GLOBAL CAPITAL, LLC**

By:_____

Name:  Ahmed Derar Islim

Title:   Interim CEO

**Exhibit A**
**Control Agreement**

# CONTROL AGREEMENT AND
# ACKNOWLEDGMENT OF PLEDGE AND SECURITY INTEREST

Grantor:                                          Lender:

TO:   Continental Stock Transfer & Trust Company
      Attn: Michael Mullings
      1 State Street, 30th Floor                              DATE:
      New York City, NY 10004

## NOTICE TO TRANSFER AGENT

RE:    Security Owner:
       Account Number:
       Description of Security:
       Number of Shares:

DEAR MADAM OR SIR:

This is to notify you that pursuant to a Pledge Agreement signed by _____ (the "Owner(s)"), _____ ("Lender") has been granted a security interest in the above described security or securities (the "Securities"), for which you are the transfer agent. You are hereby notified of Lender's security interest, including the provision that the Securities, including all dividends in stock, stock splits and other proceeds are not to be paid to anyone other than to Lender until and unless you receive further written notice from Lender. Any regular cash dividends may be paid to the Owner(s), subject to further instructions from Lender as provided below. This pledge will remain in full force and effect until Lender notifies you in writing to the contrary. Please acknowledge receipt of this notice by signing and returning the attached control agreement and acknowledgment to Lender. This notice is dated _____.

ACCOUNT OWNER AUTHORIZATION:                    AUTHORIZED OFFICER OF LENDER:

X_____       X_____
_____ Owner(s) Signature_____                Authorized signature of Lender

## CONTROL AGREEMENT AND ACKNOWLEDGMENT OF PLEDGE AND SECURITY INTEREST

We acknowledge receipt on _____, 20____ of the above notice of Lender's security interest in the above-described Securities, and we will mark our records, by book-entry or otherwise, to indicate the pledge of, and Lender's security interest in, the Securities. To the best of our knowledge, and except for Lender's security interest or as noted below, and as of the date hereof (a) the Securities are identified on our books and records, by book-entry or otherwise, as being owned by _____; (b) we have identified on our books and records the Securities as being pledged to _____; (c) we have not confirmed any interest in the Securities to any persons other than to the Owner(s) and Lender; (d) our records do not indicate any adverse claims concerning the Securities nor do they indicate any person, other than Owner(s) and Lender, as having any interest in the Securities; (e) we have not created, nor have we received notice of any liens, claims or encumbrances with respect to the Securities, except to Lender; (f) we agree not to effect any transfer of the Owner(s)' interest in any of the Securities without Lender's prior written consent; (g) should we receive further written notice from Lender, we will hold the Securities and all dividends, distributions, and other proceeds relating to the Securities (whether in cash, securities or other property) subject to Lender's written instructions. We will comply with all written instructions originated by Lender concerning the Securities without further consent by the Owner(s) except that any transfer of the Securities will require a medallion guaranteed stock power executed by the Owner(s). It is suggested that the medallion guaranteed stock power is kept with the Pledge documents in case of a default/foreclosure.

Exceptions: _____

_____

## CONTINENTAL STOCK TRANSFER & TRUST COMPANY

X _____      _____
   Authorized Officer (Signature)           Date

**Exhibit B**
**Representation Letter**

Gunderson Dettmer LLP
One Bush Street, Suite 1200
San Francisco, California 94104

**Re: Pledges of Shares of Common Units or Equal, Fractional, Undivided Interests, as applicable (the "Shares") of the Sponsored Entities (as defined below)**

Ladies and Gentlemen:

Digital Currency Group, Inc. and DCG International Investments Ltd. (the "***Shareholders***") which hold shares representing common units of the Grayscale Ethereum Trust and the Grayscale Ethereum Classic Trust (collectively, the "***Sponsored Entities***") propose to pledge (the "***Pledge***s") shares representing common units or equal, fractional, undivided interests, as applicable, of the Sponsored Entities (the "***Pledged Shares***") pursuant to the applicable Partial Repayment Agreements, dated as of September 12, 2023 (as amended, supplemented, or otherwise modified from time to time) and the related Security Agreements as defined therein (collectively, as may be amended, modified or supplemented from time to time, the "***Repayment Documents***") between each Shareholder and Genesis Global Capital, LLC (together with its affiliates, "***Genesis***"). Grayscale Investments, LLC, as the sponsor of the Sponsored Entities (the "***Sponsor***"), has requested an opinion of counsel as a condition to delivering its consent to the Pledges.  For the avoidance of doubt "***Pledged Shares***" shall also include any Shares of Grayscale sponsored entities added pursuant to any amendments or supplements to the Security Agreements.

Accordingly, in connection therewith, the undersigned, an authorized signatory of Genesis, represents and warrants to you on behalf of Genesis that:

      1.      <u>Investment Representations</u>. Any sale of Pledged Shares in satisfaction of the obligations secured by the Pledges will be (a) pursuant to private transactions for the account of the Shareholders for investment and not be with a view to, or for sale in connection with, any unregistered distribution, resale or public offering of such Pledged Shares or any part thereof in violation of the Securities Act of 1933, as amended (the "***Act***"), (b) pursuant to another exemption from registration under the Act, or (c) pursuant to a registration statement for such transaction that is effective under the Act.. The Pledged Shares were not pledged, and will not be offered or sold, with any form of general advertising or general solicitation. The transfers of the Pledged Shares in connection with any defaults under the Repayment Documents will not violate any law or regulation applicable to Genesis.

      2.      <u>Investment Experience</u>: Access to Information. Genesis (a) is an investor familiar with the business and financial condition of the Sponsored Entities, (b) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of this investment and make an informed decision to so invest, (c) has the ability to bear the economic risks of an investment in the Pledged Shares, (d) has received such disclosure regarding the

Sponsored Entities, their business, financial condition and prospects as the undersigned has determined to be necessary in connection with the Pledges and the acquisition of the Pledged Shares in the event of foreclosure of the Pledged Shares, and (e) is an "accredited investor" as that term is defined under Rule 501(a) under Regulation D under the Act (the provisions of which are known to the undersigned).

3.      <u>Restrictions on Transfer</u>. The undersigned understands that (a) in the event of any defaults under the Repayment Documents, Genesis would cause the Shareholders to sell the Pledged Shares in transactions that are exempt from registration under the Act, or the securities laws of any state; (b) the Pledged Shares are and will be "restricted securities" as such term is defined in Rule 144 of the Act; (c) the Pledged Shares may not be sold, pledged or otherwise transferred unless a registration statement for such transaction is effective under the Act and any applicable state securities laws, or unless exemptions from such registration provisions are available with respect to such transactions; and (d) the certificates or book-entry positions for the Pledged Shares will bear a legend to the effect that their transfer is subject to the provisions of the Act and that no such transfer is permitted except pursuant to an exemption from registration under the Act, accompanied by an opinion of legal counsel that such sale qualifies for an exemption from registration.

4.      The representations and warranties set forth herein shall terminate and shall be of no further effect at such time as, and to the extent, the Pledged Shares become eligible for resale pursuant to Rule 144 under the Act.

5.      The undersigned hereby agrees and acknowledges that the representations and warranties set forth herein may and will be relied upon by Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP for the purpose of rendering the legal opinion to the Sponsor with respect to the Pledges of the Pledged Shares.

This letter shall serve as our standing representation letter to you in connection with the Pledges and you need not require further letters from us to deliver such opinion of counsel.  We undertake to notify you immediately of any occurrence that would render any of the foregoing inaccurate.

Sincerely yours,

**GENESIS GLOBAL CAPITAL, LLC**

By:_____
Name:
Title:

**<u>Annex A</u>**
**DCG Stipulated Order and Judgment**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01168 (SHL) |
| Plaintiff, | |
| v. | |
| Digital Currency Group, Inc. | |
| Defendant. | |

### STIPULATED ORDER AND JUDGMENT REGARDING
### LIABILITY OF DCG UNDER MASTER LENDING AGREEMENT

Upon the submission by Genesis Global Capital, LLC ("GGC") and Digital Currency

Group, Inc. ("DCG") of this stipulated order, and the Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the

United States District Court for the Southern District of New York dated January 31, 2012; and

the parties having stipulated to the jurisdiction and venue of this Court for entry of a final

judgment in this matter; and the Court having found that adequate notice of this stipulated order

and notice has been provided; and the Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and the Court having determined

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

that the legal and factual bases set forth herein establish just cause for the relief herein granted; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT**

A.  As of the date of execution of that certain Amendment to Partial Repayment Agreement (such agreement attached hereto as **Exhibit 1** and such Amendment attached hereto as **Exhibit 2**),[2] certain specified Events of Default under that certain Amended and Restated Master Loan Agreement (the "DCG MLA"), dated as of November 10, 2022, by and between Genesis Global Capital, LLC ("GGC"), as Lender, and DCG, as Borrower, had occurred and were continuing, including the failure of DCG to return any and all amounts outstanding under the loans extended pursuant to the DCG MLA (such loans, the "DCG Loans").

B.  GGC has asserted that certain amounts are due and owing under the DCG Loans, including Late Fees under section III(c) of the DCG MLA and enforcement costs pursuant to section XII of the DCG MLA, which DCG disputes (the "Disputed Amounts").

C.  As of November 28, 2023, the aggregate outstanding principal amount of the DCG Loans that is immediately due and owing to GGC is $324,500,000 (the "DCG Judgment Amount").

D.  GGC and DCG have agreed that DCG's rights, if any, to seek a reimbursement from GGC or any other person or entity or a declaratory judgment or enforcement of its setoff

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Partial Repayment Agreement and the Amendment.

rights against GGC or any other person or entity on account of the Luno Setoff Dispute (as defined below) or a claim for payment against GGC or any other person or entity of the amounts paid by DCG to Luno Australia Pty Ltd. on behalf of GGC on November 16, 2022, as identified in that certain *Notice of Setoff*, dated December 15, 2022, in connection with that certain Limited Guaranty between DCG and Luno, and any interest accrued on the setoff amount that has been paid by DCG to GGC (the "<u>Luno Setoff Dispute</u>"), or (ii) GGC's rights or defenses with respect to the foregoing, shall remain unaffected notwithstanding the DCG Judgment Amount.

**IT IS HEREBY ORDERED THAT**

1. GGC is awarded a judgment against DCG for the DCG Judgment Amount, as reduced by any amounts that have been and are paid to GGC in respect of the DCG Loans as set forth in the Amendment.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCG Loans in addition to the DCG Judgment Amount.

3. Nothing in this Order shall affect DCG's or GGC's rights with respect to the Luno Setoff Dispute.

4. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

5. This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

6. This Court shall retain jurisdiction to, among other things, interpret, implement, and

   enforce the terms and provisions of this Order.


DIGITAL CURRENCY GROUP, INC.          GENESIS GLOBAL CAPITAL, LLC

By: _____          By:_____
Name:                                 Name:    A. Derar Islim
Title:                                Title:    Interim CEO




Dated: _____, 2023          _____
          White Plains, New York      The Honorable Sean H. Lane
                                       United States Bankruptcy Judge




20

6.  This Court shall retain jurisdiction to, among other things, interpret, implement, and

    enforce the terms and provisions of this Order.


DIGITAL CURRENCY GROUP, INC.          GENESIS GLOBAL CAPITAL, LLC

By: _Simon Koster_____          By:_____
Name: Simon Koster                      Name:
Title:   Chief Strategy Officer          Title:



Dated:        _____, 2023
              White Plains, New York          _____
                                              The Honorable Sean H. Lane
                                              United States Bankruptcy Judge


18

**<u>Annex B</u>**
**DCGI Stipulated Order and Judgment**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[3] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | |
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01169 (SHL) |
| Plaintiff, | |
| v. | |
| DCG International Investments Ltd. | |
| Defendant. | |

**STIPULATED ORDER AND JUDGMENT REGARDING**
**LIABILITY OF DCGI UNDER MASTER LENDING AGREEMENT**

Upon the submission by Genesis Global Capital, LLC ("GGC") and DCG International

Investments Ltd. ("DCGI") of this stipulated order, and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

from the United States District Court for the Southern District of New York dated January 31,

2012; and the parties having stipulated to the jurisdiction and venue of this Court for entry of a

final judgment in this matter; and the Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and the Court having found that

adequate notice of this stipulated order and notice has been provided; and the Court having

---

[3]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification
number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564);
and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the
Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

determined that the legal and factual bases set forth herein establish just cause for the relief

herein granted; and upon all of the proceedings had before the Court, and after due deliberation

and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT**

A.  As of the date of execution of that certain Amendment to Partial Repayment Agreement
(such agreement attached hereto as **Exhibit 1** and such Amendment attached hereto as
**Exhibit 2**),[4] certain specified Events of Default under that certain Master Loan
Agreement (the "DCGI MLA"), dated as of June 21, 2019, by and between Genesis
Global Capital, LLC ("GGC"), as Lender, and DCGI, as Borrower, had occurred and
were continuing, including the failure of DCGI to return any and all amounts outstanding
under the loans extended pursuant to the DCGI MLA (such loans, the "DCGI Loans").

B.  GGC has asserted that certain amounts are due and owing under the DCGI Loans,
including enforcement costs pursuant to section XII of the DCG MLA, which DCG
disputes (the "Disputed Amounts").

C.  As of November 28, 2023, the aggregate outstanding principal amount of the DCGI
Loans that is immediately due and owing to GGC is 2,737.77102141 BTC and 14,048
BCH, and the total outstanding amount of Late Fees under the DCGI MLA is
10.12600241 BTC (such amounts collectively, the "DCGI Judgment Amount").

**IT IS HEREBY ORDERED THAT**

1.  GGC is awarded a judgment against DCGI for the DCGI Judgment Amount, as reduced
by any amounts that are paid to GGC in respect of the DCGI Loans as set forth in the

---

[4]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Partial
Repayment Agreement and the Amendment.

Amendment. For the avoidance of doubt, the DCGI Judgment Amount is denominated, and shall be paid, in BTC and BCH.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCGI Loans in addition to the DCGI Judgment Amount.

3. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

4. This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

5. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.

DCG INTERNATIONAL INVESTMENTS LTD.

By: _____
Name:
Title:

GENESIS GLOBAL CAPITAL, LLC

By:_____
Name:   A. Derar Islim
Title:   Interim CEO

Dated: _____, 2023
        White Plains, New York

_____
The Honorable Sean H. Lane
United States Bankruptcy Judge

Amendment.  For the avoidance of doubt, the DCGI Judgment Amount is denominated, and shall be paid, in BTC and BCH.

2.    Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCGI Loans in addition to the DCGI Judgment Amount.

3.    Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

4.    This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

5.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.

DCG INTERNATIONAL
INVESTMENTS LTD.

By: _Michael Katz_____
Name: Michael Katz
Title:  Legal Officer

GENESIS GLOBAL CAPITAL, LLC

By:_____
Name:
Title:


Dated: _____, 2023
        White Plains, New York

_____
The Honorable Sean H. Lane
United States Bankruptcy Judge

**Executed Version**

# SECURITY AGREEMENT

This SECURITY AGREEMENT (this "Security Agreement") dated as of November 28, 2023 is between Digital Currency Group, Inc. ("Pledgor") and Genesis Global Capital, LLC ("Secured Party").

WHEREAS, reference is made to (i) that certain Partial Repayment Agreement, dated as of September 12, 2023 (as amended, supplemented, or otherwise modified from time to time, the "PRA"), by and between Secured Party, Pledgor, and DCG International Investments Ltd. ("DCGI") and (ii) that certain Amendment to Partial Repayment Agreement, dated as of November 28, 2023 (the "PRA Amendment"), by and between Secured Party, Pledgor, and DCGI;

WHEREAS, Pledgor wishes to pledge to Secured Party and grant Secured Party a security interest in Collateral (as defined below) to secure all of the Secured Obligations (as defined below);

NOW, THEREFORE, in consideration of Secured Party entering into the PRA Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  Definitions.  Capitalized terms used in this Security Agreement and not otherwise defined herein shall have the meanings in the PRA or the PRA Amendment, as applicable.  As used in this Security Agreement, the following terms have the respective meanings set forth below:

"Collateral" means all Collateral Shares, all accounts to which any Collateral Shares are credited, and all proceeds of any of the foregoing and all distributions thereon.

"Secured Obligations" means all unsatisfied obligations of Pledgor or DCGI to pay or transfer the Outstanding Undisputed Amounts to Secured Party in accordance with the PRA Amendment.

Section 2.  Transfer and Pledge of Collateral.

(a)     The parties agree that by no later than the time specified in the PRA (as amended by the PRA Amendment), Pledgor shall cause the number of ETHE Shares and ETCG Shares set forth on **Exhibit A** hereto to be (i) registered in the name of the Secured Party, or (ii) credited to a securities account in the name of the Secured Party (any shares described in (i) and (ii), "Transferred Collateral"), or (iii) registered in the name of the Pledgor and subject to an issuer control agreement in form and substance satisfactory to the Secured Party, or (iv) credited to a securities account in the name of the Pledgor and subject to a securities account control agreement in form and substance satisfactory to the Secured Party (any shares described in clause (iii) or (iv), the "Control Agreement Collateral" and all shares described in clauses (i)-(iv), the "Collateral Shares"). If any transfer agent for Collateral Shares described in clause (iii) of this Section 2(a) requires the provision of a medallion guarantee stock power, Pledgor shall provide such stock power to Secured Party, which stock power must be undated.

(b)     As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, Pledgor

1

hereby pledges to Secured Party and grants to Secured Party a first priority continuing security interest and lien on all of Pledgor's right, title and interest in and to the Collateral.

(c)    Upon the discharge in full of the Secured Obligations, the security interests under the Security Agreement shall be automatically terminated and released and Secured Party shall promptly (i) return to Pledgor all Transferred Collateral and (ii) take any and all reasonable steps within Secured Party's power to terminate any control agreement applicable to the Control Agreement Collateral (the steps described in (i) and (ii) collectively, the "Release"). By no later than the end of the third Business Day (as defined in the DCG MLA) following the discharge in full of the Secured Obligations, Secured Party will effectuate the Release. Secured Party agrees to take any additional steps as may from time to time reasonably be requested by Pledgor to evidence the release of the Collateral.

Section 3. Use of Collateral. Secured Party agrees that, until a Default occurs, Secured Party will not have the right to sell, pledge, rehypothecate, assign, or dispose of the Collateral; provided, however, that if Pledgor transfers the Collateral Shares to Secured Party through a Voluntary Payment (as defined herein), Secured Party shall apply the Collateral Shares to the Outstanding Undisputed Amount as set forth in the Voluntary Transfer Notice (as defined herein).

Section 4. Further Assurances. Pledgor shall execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by Secured Party to create, preserve, perfect or validate any security interest or lien granted under this Security Agreement, or to enable Secured Party to exercise or enforce its rights under this Security Agreement with respect to Collateral. Pledgor shall also promptly give notice to Secured Party of, and defend against, at its own cost and expense, any suit, action, proceeding, lien, claim, or demands that could adversely affect the security interest granted hereunder.

Section 5. Representations and Warranties. Pledgor represents and warrants to Secured Party, as of the date hereof and until the discharge in full of all Secured Obligations, that:

(a)    Pledgor has the power to grant the security interest set forth herein and has taken all necessary actions to authorize the granting of such security interest;

(b)    Pledgor is the sole owner of the Collateral, and the Collateral is free and clear of any security interest, lien, encumbrance, or other restriction, other than restrictions relating to the Collateral Shares arising under the Securities Act of 1933, as amended (the "Securities Act"), as a result of Pledgor being an "affiliate" of the issuer of the Collateral Shares, Pledgor's "holding period" with respect to the Collateral Shares within the meaning of Rule 144 under the Securities Act began more than one year before the date hereof;

(c)    Upon the completion of the steps described in Section 2(a) of this Security Agreement, Secured Party shall have a valid and perfected first priority security interest in the Collateral as security for the full and prompt payment and performance when due of the Secured Obligations; and

(d)    The execution and delivery of this Security Agreement, Pledgor's performance of its obligations hereunder, and the security interest set forth herein do not contravene any law, rule, or regulation, judgment, decree, order of a tribunal, agreement, or

2

instrument to which Pledgor is a party or to which Pledgor or any of Pledgor's property is subject or constitute a default or similar condition thereunder.

Section 6. <u>Secured Party's Rights and Remedies</u>.  If at any time a Default has occurred, Secured Party may exercise any and all of the following rights and remedies, all such rights and remedies being cumulative or any rights of Secured Party and its affiliates under the Loan Documents, or otherwise:

(a)     the right to set off any amounts payable by Pledgor with respect to any Secured Obligations against any Collateral (or any obligation of  Secured Party to transfer that Collateral) as set forth in this Security Agreement;

(b)     the right to liquidate any Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of Pledgor, including any equity or right of redemption by Pledgor (with Secured Party having the right to purchase any such Collateral) and apply the proceeds of such liquidation and any cash Collateral to the Secured Obligations in accordance with Section 7 of this Security Agreement;

(c)     the right to collect any amounts paid or distributions in respect of the Collateral and apply them to the Outstanding Undisputed Amounts as set forth in this Security Agreement; and

(d)     any other rights or remedies Secured Party may have at law, contract, or equity (including under the Uniform Commercial Code as in effect in any relevant jurisdiction (the "<u>UCC</u>")).

Without limiting the generality of the foregoing, if, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, including without limitation, the Securities Act, Secured Party may offer and sell such Collateral in a transaction exempt from registration under the Securities Act, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor (A) acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, (B) agrees such sales shall not be considered to be not commercially reasonable solely because they are so conducted on a restricted or private basis and (C) (I) acknowledges that Secured Party or its affiliate may purchase (through a credit bid or otherwise) Collateral itself following a customary book-build process (including if Secured Party offers such Collateral in such customary book-build process on a restricted or private basis), (II) agrees that any such sale following any such customary book-build process shall constitute a "public sale" for UCC purposes, and (III) in the event that any such sale following any such customary book-build process is determined, notwithstanding the foregoing agreement, not to constitute a "public sale" for UCC purposes, waives Section 9-610(c) of the UCC to the extent inconsistent with Secured Party's or any of its affiliate's so purchasing in any such sale. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

3

Section 7. <u>Application of Proceeds</u>. The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:

(a)    First, to the payment of the reasonable costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of Secured Party and the reasonable fees and expenses of its agents and counsel;

(b)    Second, to the payment and satisfaction in full of the Outstanding Undisputed Amounts under the DCG Loans;

(c)    Third, to the payment and satisfaction in full of the Outstanding Undisputed Amounts under the DCGI Loans;

(d)    Finally, to Pledgor, its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining. Pledgor shall be liable for all Secured Obligations that remain unsatisfied after the exercise of rights and remedies by Secured Party.

Section 8.    <u>Conveyance of Collateral</u>.  Notwithstanding anything contained herein or in the PRA Amendment, Pledgor shall have the right to convey to Secured Party all of its right, title, and interest in and to, in its sole discretion and upon written notice (each, a "<u>Voluntary Transfer Notice</u>"), all or part of the Collateral to Secured Party, at which time, such transferred Collateral shall be valued using the market prices as of 8:00 p.m. Eastern Time on the date of such written notice and Secured Party shall apply the value of such conveyed Collateral as set forth in the Voluntary Transfer Notice (the "<u>Voluntary Payment</u>"). Upon receipt of the Voluntary Transfer Notice, Secured Party shall deliver an instruction letter to the transfer agent instructing the transfer of the Collateral identified in the Voluntary Transfer Notice.  For the avoidance of doubt, Secured Party will not be required to effectuate a Release in respect of any Collateral conveyed to Secured Party hereunder.

Section 9.    <u>Appointment</u>.  Pledgor hereby irrevocably appoints Secured Party (such appointment being coupled with an interest) as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, Secured Party, or otherwise during a Default to take any action and to execute any instrument as it may deem reasonably necessary or advisable to accomplish the purposes of this Security Agreement, including without limitation to take any of the actions set forth in Section 6 above.

Section 10.    <u>Waivers by Pledgor</u>.  Pledgor agrees that, to the extent permitted by applicable law, all rights of Secured Party hereunder and the grant of a security interest in the Collateral will be absolute, irrevocable, and unconditional irrespective of:

        (a)       any claim as to the genuineness, validity, regularity or enforceability of the Loan Documents;

        (b)       the lack of authority of DCGI to execute or deliver any Loan Documents to which it is a party;

        (c)       any change in the time, manner or place of payment of, or in any other term of, all of or any of the Secured Obligations, or any other amendment, modification, extension, or waiver of or any consent to any departure from the Loan Documents;

        (d)       any change in the corporate existence, structure or ownership of DCGI, or any liquidation, dissolution, insolvency, reorganization or other similar proceeding affecting DCGI;

        (e)       any change in the technology, software, protocol, or other similar change affecting the Collateral;

        (f)       any release of any Collateral, or any guarantee or other credit support in respect thereof;

        (g)       any setoff, counterclaim, or defense of any kind or nature which may be available to or asserted by Pledgor against Secured Party or any of its affiliates;

        (h)       any law, rule, regulation, decree or order of any jurisdiction, any change in any of the foregoing, or any other event, affecting any term of DCGI's obligations under the Loan Documents or Secured Party's rights with respect thereto; or

        (i)       any other circumstance whatsoever that might otherwise constitute a defense available to, or a discharge of, Pledgor or DCGI in respect of the Secured Obligations (other than the indefeasible payment in full of all such obligations).

        Section 11.  <u>Successors and Assigns</u>.  This Security Agreement shall be binding on and shall inure to the benefit of each of the parties hereto and their respective successors and assigns to the same extent set forth in the Loan Documents.

        Section 12. <u>Entire Agreement</u>.  This Security Agreement and the Loan Documents constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof; provided, however, that to the extent there are any conflicts between this Security Agreement and the PRA Amendment, the terms of the PRA Amendment shall govern.

        Section 13.  <u>Headings</u>.  Section headings in this Security Agreement are included herein for convenience of reference only and shall not constitute a part of this Security Agreement for any other purpose.

        Section 14.  <u>Severability</u>.  Wherever possible, each provision of this Security Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.

Section 15.  Counterparts.  This Security Agreement may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Security Agreement by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Security Agreement. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Security Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 16.  Expenses.  Without limiting any terms or provisions of the Loan Documents, Pledgor agrees to pay promptly all reasonable and documented costs and expenses incurred by Secured Party in connection with the enforcement or protection of Secured Party's rights under this Security Agreement, including, without limitation, the reasonable fees, charges, and disbursements of Secured Party's legal counsel.

Section 17.  Governing Law; Jurisdiction; Waiver of Jury Trial.  This Security Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Security Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Security Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Security Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT.

Section 18.  Appointment of Process Agent.  Pledgor hereby agrees that service of process in any such action or proceeding brought in connection with this Security Agreement may be made upon it by serving a copy of any relevant pleadings on the Designated Agent. The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by Pledgor as such, and shall be legal and binding on each of Pledgor for all the purposes of any such action or proceeding.

[REMAINING SPACE INTENTIONALLY LEFT BLANK;
SIGNATURES TO FOLLOW ON NEXT PAGE]

6

DocuSign Envelope ID: 4A424BDA-EB08-4964-8841-6975568884AB

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered as of the day and year first above written.

**Digital Currency Group, Inc.**

By: _Simon Koster_ _____
Name: Simon Koster
Title:   Chief Strategy Officer

S-1

**Genesis Global Capital, LLC**

By: _____
    Name:   A. Derar Islim
    Title:   Interim CEO

# EXHIBIT A

(Collateral)

|  | Collateral ETCG Shares | Collateral ETHE Shares |
|---|---|---|
| Quantity of Shares | 1,548,717 | 37,917 |

**Executed Version**

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "Security Agreement") dated as of November 28, 2023 is between DCG International Investments Ltd. ("Pledgor") and Genesis Global Capital, LLC ("Secured Party").

WHEREAS, reference is made to (i) that certain Partial Repayment Agreement, dated as of September 12, 2023 (as amended, supplemented, or otherwise modified from time to time, the "PRA"), by and between Secured Party, Pledgor, and Digital Currency Group, Inc. ("DCG") and (ii) that certain Amendment to Partial Repayment Agreement, dated as of November 28, 2023 (the "PRA Amendment"), by and between Secured Party, Pledgor, and DCG;

WHEREAS, Pledgor wishes to pledge to Secured Party and grant Secured Party a security interest in Collateral (as defined below) to secure all of the Secured Obligations (as defined below);

NOW, THEREFORE, in consideration of Secured Party entering into the PRA Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  Definitions.  Capitalized terms used in this Security Agreement and not otherwise defined herein shall have the meanings in the PRA or the PRA Amendment, as applicable.  As used in this Security Agreement, the following terms have the respective meanings set forth below:

"Collateral" means all Collateral Shares, all accounts to which any Collateral Shares are credited, and all proceeds of any of the foregoing and all distributions thereon.

"Secured Obligations" means all unsatisfied obligations of Pledgor or DCG to pay or transfer the Outstanding Undisputed Amounts to Secured Party in accordance with the PRA Amendment.

Section 2.  Transfer and Pledge of Collateral.

(a)    The parties agree that by no later than the time specified in the PRA (as amended by the PRA Amendment), Pledgor shall cause the number of ETHE Shares and ETCG Shares set forth on **Exhibit A** hereto to be (i) registered in the name of the Secured Party, or (ii) credited to a securities account in the name of the Secured Party (any shares described in (i) and (ii), "Transferred Collateral"), or (iii) registered in the name of the Pledgor and subject to an issuer control agreement in form and substance satisfactory to the Secured Party, or (iv) credited to a securities account in the name of the Pledgor and subject to a securities account control agreement in form and substance satisfactory to the Secured Party (any shares described in clause (iii) or (iv), the "Control Agreement Collateral" and all shares described in clauses (i)-(iv), the "Collateral Shares"). If any transfer agent for Collateral Shares described in clause (iii) of this Section 2(a) requires the provision of a medallion guarantee stock power, Pledgor shall provide such stock power to Secured Party, which stock power must be undated.

(b)    As security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, Pledgor

1

hereby pledges to Secured Party and grants to Secured Party a first priority continuing security interest in and lien on all of Pledgor's right, title and interest in and to the Collateral.

(c)      Upon the discharge in full of the Secured Obligations, the security interests under the Security Agreement shall be automatically terminated and released and Secured Party shall promptly (i) return to Pledgor all Transferred Collateral and (ii) take any and all reasonable steps within Secured Party's power to terminate any control agreement applicable to the Control Agreement Collateral (the steps described in (i) and (ii) collectively, the "Release"). By no later than the end of the third Business Day (as defined in the DCG MLA) following the discharge in full of the Secured Obligations, Secured Party will effectuate the Release. Secured Party agrees to take any additional steps as may from time to time reasonably be requested by Pledgor to evidence the release of the Collateral.

Section 3. Use of Collateral. Secured Party agrees that, until a Default occurs, Secured Party will not have the right to sell, pledge, rehypothecate, assign, or dispose of the Collateral; provided, however, that if Pledgor transfers the Collateral Shares to Secured Party through a Voluntary Payment (as defined herein), Secured Party shall apply the Collateral Shares to the Outstanding Undisputed Amount as set forth in the Voluntary Transfer Notice (as defined herein).

Section 4. Further Assurances. Pledgor shall execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by Secured Party to create, preserve, perfect or validate any security interest or lien granted under this Security Agreement, or to enable Secured Party to exercise or enforce its rights under this Security Agreement with respect to Collateral. Pledgor shall also promptly give notice to Secured Party of, and defend against, at its own cost and expense, any suit, action, proceeding, lien, claim, or demands that could adversely affect the security interest granted hereunder.

Section 5. Representations and Warranties. Pledgor represents and warrants to Secured Party, as of the date hereof and until the discharge in full of all Secured Obligations, that:

(a)      Pledgor has the power to grant the security interest set forth herein and has taken all necessary actions to authorize the granting of such security interest;

(b)      Pledgor is the sole owner of the Collateral, and the Collateral is free and clear of any security interest, lien, encumbrance, or other restriction, other than restrictions relating to the Collateral Shares arising under the Securities Act of 1933, as amended (the "Securities Act"), as a result of Pledgor being an "affiliate" of the issuer of the Collateral Shares, Pledgor's "holding period" with respect to the Collateral Shares within the meaning of Rule 144 under the Securities Act began more than one year before the date hereof;

(c)      Upon the completion of the steps described in Section 2(a) of this Security Agreement, Secured Party shall have a valid and perfected first priority security interest in the Collateral as security for the full and prompt payment and performance when due of the Secured Obligations; and

(d)      The execution and delivery of this Security Agreement, Pledgor's performance of its obligations hereunder, and the security interest set forth herein do not contravene any law, rule, or regulation, judgment, decree, order of a tribunal, agreement, or

2

instrument to which Pledgor is a party or to which Pledgor or any of Pledgor's property is subject or constitute a default or similar condition thereunder.

Section 6. <u>Secured Party's Rights and Remedies</u>.  If at any time a Default has occurred, Secured Party may exercise any and all of the following rights and remedies, all such rights and remedies being cumulative or any rights of Secured Party and its affiliates under the Loan Documents, or otherwise:

(a)     the right to set off any amounts payable by Pledgor with respect to any Secured Obligations against any Collateral (or any obligation of  Secured Party to transfer that Collateral) as set forth in this Security Agreement;

(b)     the right to liquidate any Collateral through one or more public or private sales or other dispositions, free from any claim or right of any nature whatsoever of Pledgor, including any equity or right of redemption by Pledgor (with Secured Party having the right to purchase any such Collateral) and apply the proceeds of such liquidation and any cash Collateral to the Secured Obligations in accordance with Section 7 of this Security Agreement;

(c)     the right to collect any amounts paid or distributions in respect of the Collateral and apply them to the Outstanding Undisputed Amounts as set forth in this Security Agreement; and

(d)     any other rights or remedies Secured Party may have at law, contract, or equity (including under the Uniform Commercial Code as in effect in any relevant jurisdiction (the "<u>UCC</u>")).

Without limiting the generality of the foregoing, if, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, including without limitation, the Securities Act, Secured Party may offer and sell such Collateral in a transaction exempt from registration under the Securities Act, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor (A) acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, (B) agrees such sales shall not be considered to be not commercially reasonable solely because they are so conducted on a restricted or private basis and (C) (I) acknowledges that Secured Party or its affiliate may purchase (through a credit bid or otherwise) Collateral itself following a customary book-build process (including if Secured Party offers such Collateral in such customary book-build process on a restricted or private basis), (II) agrees that any such sale following any such customary book-build process shall constitute a "public sale" for UCC purposes, and (III) in the event that any such sale following any such customary book-build process is determined, notwithstanding the foregoing agreement, not to constitute a "public sale" for UCC purposes, waives Section 9-610(c) of the UCC to the extent inconsistent with Secured Party's or any of its affiliate's so purchasing in any such sale. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

3

Section 7. <u>Application of Proceeds</u>. The proceeds of any collection, sale, liquidation, or other realization of all or any part of the Collateral pursuant hereto shall be applied:

(a)    First, to the payment of the reasonable costs and expenses of such collection, sale, or other realization, including reasonable out-of-pocket costs and expenses of Secured Party and the reasonable fees and expenses of its agents and counsel;

(b)    Second, to the payment and satisfaction in full of the Outstanding Undisputed Amounts under the DCGI Loans;

(c)    Third, to the payment and satisfaction in full of the Outstanding Undisputed Amounts under the DCG Loans;

(d)    Finally, to Pledgor, its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining. Pledgor shall be liable for all Secured Obligations that remain unsatisfied after the exercise of rights and remedies by Secured Party.

Section 8.    <u>Conveyance of Collateral</u>.  Notwithstanding anything contained herein or in the PRA Amendment, Pledgor shall have the right to convey to Secured Party all of its right, title, and interest in and to, in its sole discretion and upon written notice (each, a "<u>Voluntary Transfer Notice</u>"), all or part of the Collateral to Secured Party, at which time, such transferred Collateral shall be valued using the market prices as of 8:00 p.m. Eastern Time on the date of such written notice and Secured Party shall apply the value of such conveyed Collateral as set forth in the Voluntary Transfer Notice (the "<u>Voluntary Payment</u>"). Upon receipt of the Voluntary Transfer Notice, Secured Party shall deliver an instruction letter to the transfer agent instructing the transfer of the Collateral identified in the Voluntary Transfer Notice.  For the avoidance of doubt, Secured Party will not be required to effectuate a Release in respect of any Collateral conveyed to Secured Party hereunder.

Section 9.    <u>Appointment</u>.  Pledgor hereby irrevocably appoints Secured Party (such appointment being coupled with an interest) as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, Secured Party, or otherwise during a Default to take any action and to execute any instrument as it may deem reasonably necessary or advisable to accomplish the purposes of this Security Agreement, including without limitation to take any of the actions set forth in Section 6 above.

Section 10.    <u>Waivers by Pledgor</u>.  Pledgor agrees that, to the extent permitted by applicable law, all rights of Secured Party hereunder and the grant of a security interest in the Collateral will be absolute, irrevocable, and unconditional irrespective of:

4

(a)      any claim as to the genuineness, validity, regularity or enforceability of the Loan Documents;

(b)      the lack of authority of DCG to execute or deliver any Loan Documents to which it is a party;

(c)      any change in the time, manner or place of payment of, or in any other term of, all of or any of the Secured Obligations, or any other amendment, modification, extension, or waiver of or any consent to any departure from the Loan Documents;

(d)      any change in the corporate existence, structure or ownership of DCG, or any liquidation, dissolution, insolvency, reorganization or other similar proceeding affecting DCG;

(e)      any change in the technology, software, protocol, or other similar change affecting the Collateral;

(f)      any release of any Collateral, or any guarantee or other credit support in respect thereof;

(g)      any setoff, counterclaim, or defense of any kind or nature which may be available to or asserted by Pledgor against Secured Party or any of its affiliates;

(h)      any law, rule, regulation, decree or order of any jurisdiction, any change in any of the foregoing, or any other event, affecting any term of DCG's obligations under the Loan Documents or Secured Party's rights with respect thereto; or

(i)      any other circumstance whatsoever that might otherwise constitute a defense available to, or a discharge of, Pledgor or DCG in respect of the Secured Obligations (other than the indefeasible payment in full of all such obligations).

Section 11. Successors and Assigns.  This Security Agreement shall be binding on and shall inure to the benefit of each of the parties hereto and their respective successors and assigns to the same extent set forth in the Loan Documents.

Section 12. Entire Agreement.  This Security Agreement and the Loan Documents constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof; provided, however, that to the extent there are any conflicts between this Security Agreement and the PRA Amendment, the terms of the PRA Amendment shall govern.

Section 13. Headings.  Section headings in this Security Agreement are included herein for convenience of reference only and shall not constitute a part of this Security Agreement for any other purpose.

Section 14. Severability.  Wherever possible, each provision of this Security Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.

5

Section 15.  <u>Counterparts</u>.  This Security Agreement may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Security Agreement by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Security Agreement. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Security Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 16.  <u>Expenses</u>.  Without limiting any terms or provisions of the Loan Documents, Pledgor agrees to pay promptly all reasonable and documented costs and expenses incurred by Secured Party in connection with the enforcement or protection of Secured Party's rights under this Security Agreement, including, without limitation, the reasonable fees, charges, and disbursements of Secured Party's legal counsel.

Section 17.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.  This Security Agreement and the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Security Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Security Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Security Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT.

Section 18.  <u>Appointment of Process Agent</u>.  Pledgor hereby agrees that service of process in any such action or proceeding brought in connection with this Security Agreement may be made upon it by serving a copy of any relevant pleadings on the Designated Agent. The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by Pledgor as such, and shall be legal and binding on each of Pledgor for all the purposes of any such action or proceeding.

[REMAINING SPACE INTENTIONALLY LEFT BLANK;
SIGNATURES TO FOLLOW ON NEXT PAGE]

6

IN WITNESS WHEREOF, the parties hereto have caused this Security
Agreement to be duly executed and delivered as of the day and year first above written.

**DCG International Investments Ltd.**

By: _Michael Katz_____
Name: Michael Katz
Title:  Legal Officer

S-1

**Genesis Global Capital, LLC**

By: _____

Name:    A. Derar Islim
Title:    Interim CEO

**<u>EXHIBIT A</u>**

(Collateral)

|  | Collateral ETCG Shares | Collateral ETHE Shares |
|---|---|---|
| Quantity of Shares | 1,422,175 | 4,830,343 |

**<u>EXHIBIT D</u>**
**Consent Judgment Against**
**DCG**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | |
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01168 (SHL) |
| Plaintiff, | |
| v. | |
| Digital Currency Group, Inc. | |
| Defendant. | |

**STIPULATED ORDER AND JUDGMENT REGARDING**
**LIABILITY OF DCG UNDER MASTER LENDING AGREEMENT**

Upon the submission by Genesis Global Capital, LLC ("GGC") and Digital Currency

Group, Inc. ("DCG") of this stipulated order, and the Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the

United States District Court for the Southern District of New York dated January 31, 2012; and

the parties having stipulated to the jurisdiction and venue of this Court for entry of a final

judgment in this matter; and the Court having found that adequate notice of this stipulated order

and notice has been provided; and the Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and the Court having determined

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

that the legal and factual bases set forth herein establish just cause for the relief herein granted;
and upon all of the proceedings had before the Court, and after due deliberation and sufficient
cause appearing therefor,

**THE COURT HEREBY FINDS THAT**

A. As of the date of execution of that certain Amendment to Partial Repayment Agreement
(such agreement attached hereto as **Exhibit 1** and such Amendment attached hereto as
**Exhibit 2**),[2] certain specified Events of Default under that certain Amended and Restated
Master Loan Agreement (the "DCG MLA"), dated as of November 10, 2022, by and
between Genesis Global Capital, LLC ("GGC"), as Lender, and DCG, as Borrower, had
occurred and were continuing, including the failure of DCG to return any and all amounts
outstanding under the loans extended pursuant to the DCG MLA (such loans, the "DCG
Loans").

B. GGC has asserted that certain amounts are due and owing under the DCG Loans,
including Late Fees under section III(c) of the DCG MLA and enforcement costs
pursuant to section XII of the DCG MLA, which DCG disputes (the "Disputed
Amounts").

C. As of November 28, 2023, the aggregate outstanding principal amount of the DCG Loans
that is immediately due and owing to GGC is $324,500,000 (the "DCG Judgment
Amount").

D. GGC and DCG have agreed that DCG's rights, if any, to seek a reimbursement from
GGC or any other person or entity or a declaratory judgment or enforcement of its setoff

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Partial
Repayment Agreement and the Amendment.

18

rights against GGC or any other person or entity on account of the Luno Setoff Dispute
(as defined below) or a claim for payment against GGC or any other person or entity of
the amounts paid by DCG to Luno Australia Pty Ltd. on behalf of GGC on November 16,
2022, as identified in that certain *Notice of Setoff*, dated December 15, 2022, in
connection with that certain Limited Guaranty between DCG and Luno, and any interest
accrued on the setoff amount that has been paid by DCG to GGC (the "Luno Setoff
Dispute"), or (ii) GGC's rights or defenses with respect to the foregoing, shall remain
unaffected notwithstanding the DCG Judgment Amount.

**IT IS HEREBY ORDERED THAT**

1. GGC is awarded a judgment against DCG for the DCG Judgment Amount, as reduced by
   any amounts that have been and are paid to GGC in respect of the DCG Loans as set forth
   in the Amendment.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts
   or any amounts at issue under the DCG Loans in addition to the DCG Judgment Amount.

3. Nothing in this Order shall affect DCG's or GGC's rights with respect to the Luno Setoff
   Dispute.

4. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order
   shall be effective and enforceable only upon the Court's entry of an order approving the
   Debtors' entry into the Amendment in its entirety; provided, further, that if the Court
   denies the Debtors' request to enter into the Amendment in its entirety, this Order shall
   be deemed automatically withdrawn and null and void effective immediately.

5. This Order shall be binding on each of the Parties and their respective successors and
   permitted assigns.

6. This Court shall retain jurisdiction to, among other things, interpret, implement, and

enforce the terms and provisions of this Order.


DIGITAL CURRENCY GROUP, INC.          GENESIS GLOBAL CAPITAL, LLC

By: _____       By:_____
Name:                                 Name:    A. Derar Islim
Title:                                Title:    Interim CEO




Dated:    _____, 2023     _____
          White Plains, New York      The Honorable Sean H. Lane
                                       United States Bankruptcy Judge

6.  This Court shall retain jurisdiction to, among other things, interpret, implement, and

    enforce the terms and provisions of this Order.


DIGITAL CURRENCY GROUP, INC.        GENESIS GLOBAL CAPITAL, LLC

By: _Simon Koster_____      By:_____
Name: Simon Koster                   Name:
Title:  Chief Strategy Officer       Title:



Dated: _____, 2023       _____
       White Plains, New York        The Honorable Sean H. Lane
                                     United States Bankruptcy Judge


18

## EXHIBIT E
**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Debtors. | |
| Genesis Global Capital, LLC, | |
| Plaintiff, | |
| v. | |
| Digital Currency Group, Inc., | Adv. Proc. No. 23-01168 (SHL) |
| Defendant. | |

## ORDER AUTHORIZING GGC TO TAKE ACTIONS
## IN FURTHERANCE OF THE PARTIAL REPAYMENT AGREEMENT
## WITH THE DCG PARTIES PURSUANT TO SECTION 105(a) AND 363(b) OF THE
## BANKRUPTCY CODE, OR IN THE ALTERNATIVE, BANKRPUTCY RULE 9019(a)

Upon the Motion[2] of Genesis Global Holdco, LLC and its affiliates Genesis

Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors," and the cases, the "Chapter

11 Cases"), for entry of an order (this "Order") authorizing GGC to take actions in furtherance of

the Partial Repayment Agreement with the DCG Parties and upon the *Declaration of Thomas*

*Conheeney in Support of Debtors' Motion for Entry of (I) Consent Judgment Against the DCG*

*Parties and (II) Order Authorizing, to the Extent Necessary, GGC to Take Actions in*

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC ("Holdco") (8219); Genesis Global Capital, LLC ("GGC") (8564); and Genesis Asia Pacific Pte. Ltd. ("GAP") (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

[2]      All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

*Furtherance of the Partial Repayment Agreement Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, or, in the Alternative, Bankruptcy Rule 9019(a)*; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and the Conheeney Declaration and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and on the record of the Hearing establish just cause for the relief granted herein; and all objections to the Motion (if any) having been withdrawn or overruled; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS ADJUGED, FOUND, AND DETERMINED THAT:**

A.      The facts and arguments set forth in the Motion constitute a sufficient basis for entry of this Order.

B.      The Court has jurisdiction over this Motion and the transactions contemplated by the Partial Repayment Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and

-2-

this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought in the Motion are sections 105(a) and 363 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004 and 9019.

C.     Due, proper, timely, adequate and sufficient notice of the Motion and the use of assets contemplated thereby has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Fed. R. Bankr. P. 2002 and 6004; such notice was good and sufficient, and appropriate under the particular circumstances; and no other or further notice of the Motion or use of assets contemplated thereby is or shall be required.

D.     Performance in furtherance of the Partial Repayment Agreement is in the best interests of the Debtors, their estates, and their creditors. The terms of the Partial Repayment Agreement are fair and evidence good faith, arms' length negotiations.

E.     Accordingly, performance in furtherance of the Partial Repayment Agreement reflects the Debtors' exercise of sound business judgment pursuant to section 363(b) of the Bankruptcy Code.

F.     Similarly, performance in furtherance of the Partial Repayment Agreement is within the range of reasonableness pursuant to Bankruptcy Rule 9019(a).

G.     The Debtors' performance under the Partial Repayment Agreement is appropriate under the circumstances.

**IT IS HEREBY ORDERED THAT:**

The Motion is GRANTED to the extent set forth herein.

1.      All objections to the Motion or the relief requested therein that have not
been withdrawn, waived or settled, and all reservations of rights included therein, are hereby
overruled.

2.      Pursuant to section 363(b) of the Bankruptcy Code, the Partial Repayment
Agreement, and all terms and conditions thereof, and all transactions contemplated thereby, are
approved in all respects, to the extent required.

3.      Alternatively, the Partial Repayment Agreement, and all terms and
conditions thereof, and all transactions contemplated thereby, are approved in all respects, to the
extent required, pursuant to Bankruptcy Rule 9019.

4.      The Debtors are authorized to execute and deliver, and empowered to
perform under, any additional instruments, documents and agreements that may be reasonably
necessary or desirable in order to implement, or otherwise in connection with, the Partial
Repayment Agreement, and to take all further actions as may be necessary or appropriate to the
performance of its obligations as contemplated by the Partial Repayment Agreement.

5.      The Court shall enter the Consent Judgment against DCG as a separate
entry on the adversary docket for the DCG Turnover Action.

6.      The provisions of the Partial Repayment Agreement are incorporated
herein by reference and shall be effective and binding as though fully set forth herein.  The
failure to include or reference any term of the Partial Repayment Agreement in this Order shall
not diminish or impair the effectiveness of such provisions of the agreement which shall be
approved and enforceable in their entirety.

7.      Nothing herein shall constitute an assumption, adoption, or rejection by any of the Debtors of any executory contract or agreement between any Debtor or Debtors and any third party.

8.      This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, their creditors, DCG and its respective affiliates, successors, and assigns, and any affected third parties, notwithstanding the subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) this Order likewise shall be binding.

9.      The terms and provisions of this Order shall be immediately effective and enforceable upon its entry. The effectiveness of this Order shall not be stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure or otherwise.

10.     The Debtors' claims agent, Kroll Restructuring Administration, and the clerk of this Court are authorized to take all actions necessary and appropriate to give effect to this Order and the Partial Repayment Agreement.

11.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation, interpretation or enforcement of this Order.


Dated: _____, 2023
          New York, New York

                                        _____
                                        HONORABLE SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE